[No. B039745. Second Dist., Div. Two. July 18, 1990.]

MERIDIAN OCEAN SYSTEMS, INC., et al., Plaintiffs and Appellants, v.
CALIFORNIA STATE LANDS COMMISSION, Defendant and Appellant.

154

COUNSEL

Latham & Watkins, Betty-Jane Kirwan, McClintock, Weston, Benshoof, Rochefort, Rubaclava & McCuish and Jocelyn Niebur for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Terry T. Fujimoto, Deputy Attorney General, for Defendant and Appellant.

OPINION

ROTH, P. J.—

## INTRODUCTION

Meridian Ocean Systems, Inc., Pelagos Corporation and Geophysical Services, Inc. have conducted ocean research during the past years pursuant to permits issued by the California State Lands Commission (hereinafter referred to as the Commission). In 1987, the Commission refused to renew their permits until an environmental impact report had been prepared because the Commission concluded their activities posed a potential threat to the environment. The three commercial entities then obtained from the superior court a judgment granting a peremptory writ of mandate compelling the Commission to issue them interim permits pending completion of the environmental impact report. The Commission has appealed from that decision contending the superior court was powerless to enter such an order. The three businesses have filed a cross-appeal attacking the superior court's decision that the Commission even had the authority to order preparation of an environmental impact report.

### FACTUAL AND LEGAL BACKGROUND

Meridian Ocean Systems, Inc., Pelagos Corporation and Geophysical Services, Inc. (hereinafter collectively referred to as petitioners) conduct seismic research in the ocean. They use compressed air and water devices released under the water to generate acoustic pulse signals. The signals are reflected off of the ocean floor and are analyzed to develop an approximation of the geological features of the surface and subsurface of the ocean floor. The data locates archeological sites and oil and gas reserves, defines

subsurface geologic structures so as to safely position docks and other structures on the sea floor, and identifies potential earthquake faults.

The Commission has the exclusive authority to exercise supervision over the state's tide, submerged lands and navigable waterways. (Pub. Resources Code, § 6301.) In that regard, it has the discretion to determine whether geophysical surveys should be permitted in California waters and to promulgate regulations specifying the conditions upon which such permits may be issued. (Pub. Resources Code, § 6826.) The Commission is comprised of the Lieutenant Governor, the State Controller, and the State Director of Finance. (Pub. Resources Code, § 6101.)

Geophysical research has been conducted in California waters since the 1940's. In the early years, explosive devices were used to generate the acoustic pulse signals by which the information was gathered. However, beginning in 1967, the nonexplosive techniques, as utilized by petitioners, were implemented.

In 1972, the Legislature enacted the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.) CEQA requires public agencies, including the State Lands Commission, to consider the environmental impact of an activity or project before approving it. (Pub. Resources Code, §§ 21063 and 21100.) A project is defined as ". . . the whole of an action, which has a potential for resulting in a physical change in the environment" and includes [¶]"An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Cal. Code Regs., tit. 14, § 15378, subd. (a)(3).)

CEQA sets forth three levels of environmental review. First, an agency may adopt a categorical exemption from CEQA based on its conclusion that the activity for which a permit is sought will not have a significant effect on the environment. (Pub. Resources Code, § 21084.) The significance of a categorical exemption is that no further environmental review is required prior to approval.

The second level of review attaches when a project is not categorically exempt. In that situation, the agency must determine whether there is a reasonable possibility the project will have a significant environmental impact. If the subsequent study demonstrates said possibility does not exist, then the agency prepares a negative declaration to that effect. (Pub. Resources Code, § 21080, subd. (c).) This then has the effect of permitting the project to go forward.

On the other hand, if the agency determines that there is a reasonable possibility the project will significantly impact the environment, then the agency must prepare an environmental impact report (EIR) before approval of the project can be granted. (Pub. Resources Code, § 21100.)

An EIR is an informational document which provides public agencies and the public with detailed information about the environmental effect of a project, the methods by which the significant effects of the project may be minimized, and alternatives to the project. The public is notified a draft EIR is being prepared and the draft EIR is evaluated in light of comments received. The public agency then prepares a final EIR incorporating comments received about the draft EIR and the agency's responses to significant environmental points. The agency must consider the EIR before approving or disapproving the project. If the agency approves the project, it must find the project's significant environmental effects have been avoided or mitigated or that the unmitigated effects are outweighed by the project's benefits. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391 [253 Cal.Rptr. 426, 764 P.2d 278], and statutory and administrative authorities cited therein.)

". . . Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citation.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 392.)

In 1981, the Commission adopted regulations exempting geophysical survey operations from CEQA review (Cal. Code Regs., tit. 2, § 2905, subd. (e) (3)) based upon its finding geophysical testing did not have a significant effect upon the environment.[1] Thus, the adoption of the exemption negated the necessity of any further environmental review before permits would be issued.

In 1982, the Commission, acting upon the authority granted by Public Resources Code section 6826, established for the first time a permit program governing all geophysical research. In August 1982, it issued

---

[1] California Code of Regulations, title 2, section 2905, subdivision (e)(3) exempts from review: "Surface or underwater biological, geological, geophysical, cultural (archeological/historical), and geochemical surveys where minimal or no disturbance of the land surface results."

18–month permits to petitioners Geophysical Services, Inc., and Pelagos Corporation.

Shortly thereafter, the Commission began to receive complaints about the negative effects of geophysical research on marine and mammal life including claims of injury, harassment, death, and dispersal. A task force was created to evaluate the situation, with particular emphasis on the impact of airguns on fish and marine mammals. The task force concluded that "Further study in the area of off-shore geophysical testing [should] be encouraged . . . ."

In the following months, representatives of the fishing industry, public interest groups, and public agencies recommended to the Commission that it require preparation of an EIR before authorizing any new permits for geophysical research. A study prepared for the United States Department of the Interior in November 1983 noted the potentially adverse effect that use of air guns had on migratory whales, a federally protected species.

In view of these events, the Commission concluded that its previously granted categorical exemption to geophysical research from the CEQA review process was no longer appropriate and ordered preparation of an initial study[2] to determine if the activity could be modified to mitigate its adverse impacts.

The study, released in January 1984, concluded that as long as substantial changes were implemented, the geophysical permit program would not have a significant effect on the environment. However, if the questioned activities were allowed to continue "without mitigation, [they could] potentially result in environmental impacts . . . ."

In February 1984, the Commission conducted a public hearing to determine whether new geophysical permits should be issued or whether such activities should be suspended pending further environmental review. Significant opposition to issuing new permits materialized. Because of the uncertainty of the effects of geophysical testing, the Commission extended the then existing permits, including those previously issued to petitioners, to May 1984 and ordered completion of the environmental review of the program.

At the May 1984 hearing, which two of the petitioners attended, opposition to the issuance of new permits intensified. Although many urged the

---

[2] An initial study is conducted to determine if a project may have a significant effect on the environment. (Cal. Code Regs., tit. 14, § 15063.)

Commission to prepare an EIR before authorizing any new permits, the Commission decided to issue new permits for a three-year period. The Commission did so by utilizing the second level of review provided by CEQA. That is, it certified a negative declaration that there was not a reasonable possibility that geophysical research as governed by a newly revised permit program would have a significant impact on the environment. Nonetheless, the Commission stated it would continue to evaluate the matter and to that end would seek funding for additional scientific research. Petitioners, as well as more than 20 other applicants, received 3-year permits as a result of the May 1984 hearing.

In June 1986, petitioner Geophysical Services, Inc., in anticipation of the May 1987 expiration of its then-effective permit, submitted its application for a new permit. In December 1986, the Commission asked petitioner to agree to a 90-day extension for the Commission to act on the application. Petitioner agreed. In February 1987, the Commission asked petitioner to withdraw its application and resubmit it to grant its staff more time to evaluate it. It stated that if this alternative was not accepted, the application would be denied because its staff would not be able to complete review within the applicable time frame. Petitioner acquiesced and resubmitted its application that month.

Petitioner Pelagos Corporation submitted its application for a new permit in January 1987 and petitioner Meridian Ocean Systems did the same in March 1987.

On May 28, 1987, shortly before the prior permits would expire, the Commission authorized a 120-day extension of all existing permits to give it additional time to collect and analyze data on the environmental impact of geophysical operations.

On September 23 and October 7 of 1987, the Commission conducted public hearings at which different constituencies expressed substantial opposition to approving new permits before an EIR could be prepared. Although there was disagreement among experts, the opponents of geophysical testing primarily raised two claims. The first was that when conducted during spawning periods, the activity could result in a reduction in the fish population. The second was that when carried on at any time, the testing caused fish to leave their normal feeding areas and to deviate from traditional behavior patterns. So displaced, the fish become more vulnerable to predation and starvation. The Commission concluded geophysical research

posed a potential threat to the environment and denied petitioners' applications for high energy permits pending preparation of an EIR.[3]

Petitioners' response was to file suit in February 1988 seeking to compel the Commission to issue them high energy permits without any conditions and to prevent the Commission from requiring that an EIR be prepared prior to issuance.

Ultimately, the trial court grafted a compromise. It ruled the Commission's decision to order an EIR was proper but that the Commission was estopped from denying permits to petitioners pending preparation of the EIR because had the Commission not delayed in processing their applications, the EIR could have been completed before expiration of the then-existing permits. The court therefore ordered the Commission to issue interim permits upon execution by petitioners of an agreement to reimburse the Commission for all costs incurred in preparing the EIR.[4] The permits were to remain in effect until the EIR was completed and the Commission had granted or denied the application for new permits following submission of the EIR.

The trial court's disposition of the matter did not satisfy any of the parties. The Commission appealed and petitioners filed a cross-appeal. During the pendency of these appellate proceedings, nothing has happened. The Commission maintains the filing of its appeal stayed the trial court's decision so that an EIR has not been initiated nor have petitioners received interim permits. Petitioners state they never executed the reimbursement agreement because they believe the trial court's underlying orders were erroneous. In any event, it is conceded petitioners have not obtained the interim permits, petitioners have not conducted geophysical testing in California waters, and an EIR has not been prepared. The issues are therefore still ripe for review.

DISCUSSION

First, we will examine petitioners' contentions that the Commission's actions are inconsistent with the law. Second, we will evaluate petitioners'

---

[3] The Commission did authorize the issuance of low energy permits because it concluded that when lower acoustical energy levels were employed, no environmental risks were apparent. Those permits, however, would not cover petitioners' activities.

[4] Public Resources Code section 21089 provides: "A public agency may charge and collect a reasonable fee from any person proposing a project . . . in order to recover the estimated costs incurred by the public agency in preparing . . . an environmental impact report for such project."

claim the Commission's decision is unsupported by the evidence. Lastly, we will analyze the Commission's assertion that the trial court could not properly order it to issue interim permits to petitioners.

## THE COMMISSION PROPERLY ORDERED PREPARATION OF AN EIR

Petitioners first contend the Commission is precluded from requiring an EIR for geophysical research because in 1981 it had specifically exempted those operations from the CEQA review process. We disagree.

Geophysical research was initially exempted because it was determined not to have a ". . . significant effect on the environment." (Pub. Resources Code, § 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300.)

However, an exemption shall not be used ". . . where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Cal. Code Regs., tit. 14, § 15300.2, subd. (c).) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (Pub. Resources Code, § 21068; Cal. Code Regs., tit. 14, § 15382.)

Invoking an exception to a categorically exempt activity necessitates a decision as to whether there is a ". . . *possibility* of a significant effect on the environment which is at issue, not a determination of the actual effect, which would be the subject of a negative declaration or an EIR." (*Lewis* v. *Seventeenth Dist. Agricultural Assn.* (1985) 165 Cal.App.3d 823, 830 [211 Cal.Rptr. 884]; italics in original.)

The Commission urges that scientific research conducted since the exemption was granted in 1981 demonstrates there is a reasonable possibility that the geophysical testing engaged in by petitioners could result in a potentially substantial adverse change in the environment due to the effects of the testing on marine and mammal life. The Commission also argues that the unusual circumstances necessary to trigger an exclusion from the exemption are present in that this scientific evidence was not available until after the exemption had been adopted. Petitioners, on the other hand, urge the exemption can only be withdrawn if the Commission shows that the geophysical activities are now being conducted in a different manner than they had been prior to adoption of the exemption or if there has been a change in the environment since adoption of the exemption.[5]

---

[5]Contrary to petitioners' claims, neither *Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827 [171 Cal.Rptr. 753] nor *Campbell* v. *Third Dist. Agricultural Assn.* (1987) 195 Cal.App.3d 115 [240 Cal.Rptr. 481], supports their position. As both cases involve

We reject petitioners' crabbed view. Acceptance of their position would mean that because the adverse environmental effects of a particular conduct are not known until after the exemption is approved, the Commission is rendered powerless to conduct a proper environmental review of the questioned activity. (See *Lewis* v. *Seventeenth Dist. Agricultural Assn., supra,* 165 Cal.App.3d 823, 828-831.) That result would impermissibly corrode the Commission's authority as administrator of the "public trust" (Pub. Resources Code, § 6301) and would directly contradict CEQA's stated purpose of "[t]he maintenance of a quality environment for the people of this state now and in the future . . . ." (Pub. Resources Code, § 21000, subd. (a).) Inherent in the Commission's power to issue permits is the ability to re-evaluate the conditions surrounding their issuance as warranted by changing circumstances. As the trial court noted when rejecting petitioners' claim: "By its very nature the protection of the environment to some degree, to a large degree, if not entirely, is a function of the technology that allows us to measure the deleterious effects of any activity or chemical or whatever it is has."

■ Petitioners next contend that the Commission's failure either to formally revoke the exemption or to formally invoke the exception to the exemption means that the exemption must still be given effect. Quite apart from the fact that petitioners cite no statutory or regulatory authority for either of these propositions, the claims are not logical.

The reason the Commission is permitted to except an action from an already existing exemption is to provide an alternative course of action to revocation of the exemption. Requiring revocation would nullify that option.

Moreover, compelling the Commission to formally invoke the exception would elevate form over substance. No particular talismanic phrase is needed to invoke the exception. We believe that given the development of the present controversy, petitioners were adequately apprised of the Commission's intent. The Commission's 1983 decision to prepare an initial study demonstrated the Commission no longer considered petitioners' actions immune from CEQA review as an initial study can only be required when there is a determination a project is not exempt. (See Cal. Code Regs., tit. 14, § 15002, subd. (k).) The May 1984 hearing, which two of the petitioners attended, culminated in the certification of the negative declaration and the issuance of three-year permits to all of the petitioners. And the Commission's ultimate decision to order an EIR was tantamount to finding the

diverse and completely inapposite fact patterns, nothing would be gained by dissecting their holdings.

necessary facts to trigger the exception. Indeed, petitioners have never claimed the Commission's intent was unclear.

## THE PERMITS HAVE NOT BEEN APPROVED BY OPERATION OF LAW

Two petitioners, Geophysical Services, Inc., and Pelagos Corporation, next contend the Commission's failure to deny their applications for permits within six months from their initial submission resulted in approval of the applications by operation of law, thereby rendering ineffective the Commission's ultimate formal denial made in October 1987. That is, they urge the permits should be deemed issued without any EIR. (Petitioner Meridian Ocean Systems, Inc., does not join in this claim as its application was denied within six months of its submittal date.)

The legal predicate of this claim is the Permit Streamlining Act (PSA) (Gov. Code, § 65920 et seq.) When the Legislature enacted this statutory scheme in 1977, entitled "Review and Approval of Development Projects," it stated its intent to be: "The Legislature finds and declares that there is a statewide need to ensure clear understanding of the specific requirements which must be met in connection with the approval of development projects and to expedite decisions on such projects." (Gov. Code, § 65921.)

The provisions upon which petitioners rely are as follows. Government Code section 65950 states: "Any public agency which is the lead agency for a development project for which . . . a negative declaration is adopted or if the project is exempt from [the requirements of an EIR] . . . the development project shall be approved or disapproved within six months from the date on which an application requesting approval of the project has been received and accepted as being complete by that agency, unless the project proponent requests an extension of the time limit." Government Code section 65956, subdivision (b) then provides: "In the event that a lead agency or a responsible agency fails to act to approve or disapprove a development project within the time limits required by this article, such failure to act shall be deemed approval of the development project."

We believe the express language of the PSA as well as the underlying legislative intent militate against its application to this proceeding.

First, the act only applies to a development project which is defined as ". . . any project undertaken for the purpose of development. 'Development project' includes a project involving the issuance of a permit for construction or reconstruction *but not a permit to operate. . . .*" (Gov. Code, § 65928; italics added.)

In *Palmer* v. *City of Ojai* (1986) 178 Cal.App.3d 280, 290 [223 Cal.Rptr. 542] [review denied], the Court of Appeal explained the "unmistakably clear" legislative intent of the PSA: "There was a dual concern for (1) establishing guidelines for communication between developer-applicants and public agencies, communication intended to remove gamesmanship from the application process, and (2) establishing time limitations which would allow full and fair consideration of applications for development by public agencies while protecting the applicants from the arbitrariness and caprice associated with unjustifiable delay."

In light of the clear statutory language and judicial interpretation thereof, we find the PSA inapplicable to the case at bench. Petitioners are not developers in the classic sense. They seek only a permit to conduct geophysical research through operation of air guns. They do not wish to obtain permits to do any form of development, let alone construction or reconstruction. Thus, as a matter of law, the PSA does not apply as petitioners' activities do not fall within the ambit of activities covered by the act.[6]

Moreover, the provisions of the PSA apply only to adjudicative proceedings, not to quasi-legislative actions. (*Landi* v. *County of Monterey* (1983) 139 Cal.App.3d 934 [189 Cal.Rptr. 55].) An adjudicatory act involves the actual application of already existing rules to a specific set of existing facts whereas a quasi-legislative action is the formulation of a rule to be applied to all future cases. (*Patterson* v. *Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 840-841 [130 Cal.Rptr. 169].)

We conclude the contested action of the Commission can most accurately be characterized as quasi-legislative, as the primary thrust of its deliberations was the policy decision as to whether it should continue to issue high energy permits to any party who engaged in geophysical research utilizing underwater airguns without first requiring an EIR. The hearings and review were triggered not just by petitioners' applications but also by those submitted by more than a dozen other parties. Hence, the Commission was not called upon to perform the adjudicative function of determining whether these two petitioners met the already existing criteria governing permit issuance. The Commission's dominant concern was evaluating seismic research's effect on the environment and developing guidelines to regulate that activity. (See *Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256

---

[6]Petitioners place great emphasis on the fact that several times during the administrative proceedings, the Commission appeared to indicate that the PSA did apply to its actions. Petitioners' reliance is misplaced as a party's statements cannot confer nonexistent jurisdiction. However, the Commission's conduct in that regard is relevant to evaluating whether the trial court could order the Commission to issue interim permits. (See pp. 171-173, *post.*)

Cal.App.2d 271, 280-281 [63 Cal.Rptr. 889].) Consequently, the policy for applying the PSA does not attach. ". . . Government Code section 65950 expedites the determination of the application of existing rules to an individualized set of existing facts. It was not meant to impose a rigorous timetable on [the] government's exercise of its policy-making legislative function." (*Landi* v. *County of Monterey, supra*, 139 Cal.App.3d at p. 937.)

■ In a similar vein, petitioners urge the Commission's failure to order preparation of an EIR within 30 days of their application renders invalid its subsequent actions. Petitioners rely upon Public Resources Code section 21080.2. which provides that determinations of whether an EIR is required ". . . shall be made within 30 days from the date on which an application for a project has been received and accepted as complete by the lead agency." Resolution of this claim turns upon a determination of whether the 30-day time limit is mandatory or directory; if it is mandatory, the failure to comply with the 30-day rule invalidates the Commission's subsequent decision to order an EIR.

". . . . [T]he 'directory' or 'mandatory' designation does not refer to whether a particular statutory requirement is 'permissive' or 'obligatory,' but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates. [Citations.]" (*Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606]; fn. omitted.)

Requirements relating to the time within which an act must be done are directory rather than mandatory unless a contrary intent is clearly expressed. (*Edwards* v. *Steele* (1979) 25 Cal.3d 406, 410 [158 Cal.Rptr. 662, 599 P.2d 1365] and cases cited therein.) Failure to provide for a consequence or penalty for noncompliance strongly suggests that the provision is merely directory. (*Garrison* v. *Rourke* (1948) 32 Cal.2d 430, 435-436 [196 P.2d 884].) Public Resources Code section 21080.2 does not provide for any consequence for noncompliance nor is there anything in the statutory language to suggest an intent to nullify a subsequent decision to order an EIR solely because the Commission initially delayed in making that determination. We therefore construe the provision to be directory and reject petitioners' claim.[7]

---

[7] As noted earlier (see fn. 6, *ante*) the Commission's delays are relevant in determining whether the Commission can be ordered to issue interim permits pending completion of the EIR. (See discussion at pp. 171-173, *post.*)

SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S DECISIONS

We now examine petitioners' contention that the trial court erred in finding the evidence sufficient to support the Commission's decision to invoke the exception to the exemption and to order preparation of the EIR. As petitioners concede these issues are intertwined,[8] we set forth together the facts relevant to both decisions.

As previously noted, when the Commission adopted in 1981 the categorical exemption for geophysical operations, there was neither evidence that the actions posed a significant threat to the environment nor opposition to the Commission's adoption of the exemption. However, in 1982, complaints were lodged with the Commission about the effects of the testing. The subsequently created task force recognized the validity of the concerns and recommended further study in the area. In 1983, following the publication of a federal study indicating the potential adverse impact of this research on a federally protected species, the Commission concluded the exemption was no longer appropriate and initiated the CEQA review process by directing the preparation of an initial study. That study, released in January 1984, noted that geophysical research could potentially result in environmental impacts if mitigating steps were not taken. In May 1984, the Commission certified the Negative Declaration that geophysical research regulated by the newly revised permit program would not have a significant impact on the environment. In 1987, the Commission conducted hearings and reviewed additional research. In October 1987, after noting that there was both disagreement among experts as to the environmental effects of geophysical research and public controversy on the matter, the Commission ordered preparation of an EIR.

The record contains substantial evidence to support the conclusion that there was a reasonable possibility that petitioners' activities would have a substantially adverse effect upon the environment. The evidence, albeit conflicting, indicated the use of air guns caused marked changes in fish behavior, injured and/or killed marine life, and resulted in significant decrease in the catch of commercial fish. The fact that the 1984 initial study noted that unless mitigating steps were taken there potentially could be adverse impacts fortifies this conclusion. (*Lewis* v. *Seventeenth Dist. Agricultural Assn., supra,* 165 Cal.App.3d at pp. 830-831.) Petitioners' assertion to the contrary is nothing more than a request that this court scour the

---

[8] In their brief, petitioners state: "Given that a categorical exemption for geophysical permits exists, the court could have decided the Commission's insistence upon an EIR was justified based on evidence . . . which supports the existence of an exception to the categorical exemption."

administrative record for isolated pieces of evidence which would support a different conclusion. The request is improper as it is not this court's function to independently weigh the evidence. (See, in general, *Dehne* v. *County of Santa Clara, supra,* 115 Cal.App.3d at pp. 844-845 and authorities cited therein.)

Insofar as the Commission's decision to order preparation of an EIR is concerned, that determination will be upheld "when . . . there is substantial evidence that a project may have a significant effect on the environment . . ." (Cal. Code Regs., tit. 14, § 15064, subd. (a)(1).) In this context, "'substantial evidence' . . . means [that there is] enough relevant information and reasonable inferences from the information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. . . ." (Cal. Code Regs., tit. 14, § 15384, subd. (a).) In applying this standard, this court may not substitute its judgment for that of the state agency and must resolve reasonable doubts in favor of its decision. (See *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1513 [258 Cal.Rptr. 267], and authorities cited therein.)

In attacking the sufficiency of the evidence to support the Commission's decision, petitioners place great emphasis on the disagreement in the scientific community on the effects of geophysical testing and the absence of definite conclusions in the area. In so doing, they are essentially urging there must be absolute certainty that a project does have a significant effect on the environment before it can direct preparation of an EIR. This attack misapprehends the criteria relevant to deciding if an EIR is warranted. The Commission is directed that "[i]n marginal cases where it is not clear whether there is substantial evidence that a project may have a significant effect on the environment, [it] . . . shall be guided by the following factors: (1) If there is serious public controversy over the environmental effects of a project, [it] . . . shall consider the effect or effects subject to the controversy to be significant and shall prepare an EIR . . . . (2) If there is disagreement between experts over the significance of an effect on the environment, [it] . . . shall treat the effect as significant and shall prepare an EIR." (Cal. Code Regs., tit. 14, § 15064, subd. (h).) In light of these principles, the Commission's decision is unassailable.

Nor is there any merit to petitioners' claim that the public controversy is purely economic and not environmental because it was prompted by fishermen who claim the size and quality of their catches have been impaired by petitioners' activities.[9] While those whose livelihood depends upon being

---

[9] Pursuant to Code of Civil Procedure section 387, the trial court granted South Coast Fisherman's Association (SCFA) leave to intervene in the superior court proceedings

able to catch fish may have pecuniary motivations to bring the matter to public attention, the fact marine and fish life is being threatened is surely a legitimate environmental concern.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ORDERING THE COMMISSION TO ISSUE INTERIM PERMITS

The Commission contends that the superior court erred in ordering it to issue interim permits to petitioners pending completion of the EIR. The Commission argues that the important public interest of protecting the environment will be defeated if petitioners are allowed to conduct research while the EIR is compiled and that there is no statutory authorization for issuance of interim permits. On the facts of this case, we reject these claims.

At bench, petitioners sought to avoid being caught in the situation of having to suspend their businesses while an EIR was prepared by submitting their permit applications prior to the expiration of their then current permits in May 1987. Petitioner Geophysical Services, Inc., did so thirteen months in advance; petitioner Pelagos Corporation did so five months in advance; and petitioner Meridian Ocean Systems did so two months in advance.

At that time, the Commission was well aware of the controversy surrounding geophysical research. In 1982, it received complaints about the negative effects of the research. In 1983, different constituencies urged preparation of an EIR before any new permits were issued. As a result, the Commission ordered, in 1983, an initial study on the matter. In 1984, it conducted public hearings and ultimately certified a negative declaration. Nonetheless, the Commission did not order preparation of an EIR after petitioners submitted their applications and before their permits expired.

Balancing these factors and taking into account that effects of geophysical testing had not yet been conclusively established, the trial court fashioned the remedy of permitting petitioners to continue their businesses while the EIR was prepared. The Commission attacks this ruling because normally a party is not permitted to conduct an activity while an EIR is prepared.

In appropriate instances, a trial court can estop the government from invoking its authority if such is required by justice and it will not

initiated by petitioners. SCFA is an association of commercial fishermen who alleged they would be adversely impacted by petitioners' activities. SCFA, however, is not a party to this appellate proceeding.

nullify an important public policy. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 496-497 [91 Cal.Rptr. 23, 476 P.2d 423].) Essentially, that is what happened here. The issue is whether given the particular facts of this case, that order was an abuse of discretion.

To begin, we reject the Commission's argument that ordering it to issue interim permits will defeat the important public interest of protecting the environment. The implicit predicates of this argument are that the negative effects of petitioners' activities have been unequivocally established and that upon completion of the EIR, the Commission will deny petitioners' permits. Not so.

While the Commission is legitimately concerned about the impact of geophysical research, we are upholding its decision to order preparation of an EIR merely because there was substantial evidence petitioners' actions ". . . *may* have a significant effect on the environment . . . ." (Cal. Code Regs., tit. 14, § 15064, subd. (a)(1); italics added.) Ordering an EIR does not compel the conclusion that petitioners will be prohibited in the future from conducting geophysical research. At this juncture, the ultimate contents of the EIR are unknown, as is the Commission's final decision as to whether potential adverse impacts can be mitigated and/or are outweighed by the benefits of petitioners' activities.

Moreover, to the extent that permitting petitioners to do geophysical research could harm the environment, the trial court took those concerns into consideration as it specifically provided: "[T]he Commission may exercise its discretionary authority to condition the approval of a specific survey proposed by a permittee upon reasonable terms and restrictions as required to ensure the public's health, welfare and safety."

In any event, given the dispute in the scientific community on the effects of geophysical research, all of the surrounding circumstances in this action should be considered in deciding whether, on balance, it is fairer to grant petitioners interim permits while the EIR is prepared. In that regard, the Commission's lengthy delay in processing the applications and its failure to offer a satisfactory explanation for its inaction coupled with the fact that denial of interim permits would have precluded petitioners from carrying on their businesses all weigh in favor of the trial court's order. Moreover, the precedent set in this case is extremely narrow as it is dependent upon a confluence of numerous circumstances unlikely to recur, to wit the environmental reevaluation of an activity which had heretofore been authorized and lengthy governmental inaction in response to applications to renew

permits to carry on that activity. In sum, the trial court's order was not an abuse of discretion.[10]

■ Lastly, we note that the trial court's conditioning issuance of the interim permits upon execution by petitioners of an agreement to reimburse the Commission for the costs incurred in preparing the EIR was lawful as CEQA specifically provides for the charge and collection of a reasonable fee to pay those expenses. (Pub. Resources Code, § 21089, *ante*, at fn. 4.) However, we express no opinion on the appropriate amount of the reimbursement agreement as petitioners have not factually challenged, either in the trial court or on this appeal, the reasonableness of a particular figure.

DISPOSITION

The judgment is affirmed. The parties to bear their own costs on the appeal and cross-appeal.

Compton, J., and Gates, J., concurred.

---

[10]The Commission's subsidiary argument that compelling it to issue interim permits directly contravenes its powers fails as nothing in either the administrative or statutory scheme prohibits the use of interim permits.