[No. B090551. Second Dist., Div. Two. Oct. 25, 1995.]

CITY OF LOS ANGELES, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
MIYAMOTO OF USA, INC., et al., Real Parties in Interest.

594

## COUNSEL

James K. Hahn, City Attorney, Claudia McGee Henry, Assistant City Attorney, Patricia V. Tubert, Gwendolyn Ryder Poindexter and Susan D. Pfann, Deputy City Attorneys, for Petitioner.

No appearance for Respondent.

Stephen L. Jones for Real Parties in Interest.

## OPINION

**FUKUTO, J.**—Petitioner, the City of Los Angeles (City), seeks an extraordinary writ of mandate directing the superior court to set aside orders issuing writs of mandate in two related cases filed by real parties in interest,[1] Kang and Miyamoto.

[1]Real parties are Miyamoto of USA, Inc., a California corporation, and Satoshi Miyamoto (collectively Miyamoto), and Tony Kang and Tai Kang (collectively Kang).

## I. Factual and Procedural History

Since April 1985, the City has required a conditional use permit for off-site alcoholic beverage sales citywide. (L.A. Mun. Code, § 12.24.) In April 1987, the City adopted Los Angeles Municipal Ordinance No. 162128, known as the South Central Alcohol Sales Specific Plan, which added off-site retail alcohol sales to the zoning codes as a use requiring a conditional use permit. (*Korean American Legal Advocacy Foundation* v. *City of Los Angeles* (1994) 23 Cal.App.4th 376, 382 [28 Cal.Rptr.2d 530] (*KALAF*).)

Under either ordinance, existing uses before their operative dates became "deemed to be approved" conditional uses. (L.A. Mun. Code, § 12.24F.)[2] Thus, businesses such as those owned by Kang and Miyamoto which operated before either the citywide conditional use permit ordinance or the specific plan were "grandfathered" and given "deemed approved" conditional use status. (*KALAF, supra*, 23 Cal.App.4th at p. 382.)

During the civil unrest in 1992, a number of businesses were destroyed, including liquor stores belonging to Kang[3] and Miyamoto.[4] Shortly after the civil unrest subsided, the City enacted legislation to facilitate rebuilding. A temporary ordinance was adopted which provided for expedited procedures to process building permits in conformity with existing code provisions. (L.A. Mun. Ord. No. 167909.) Despite these expedited procedures, however, all conditional use permit holders for selling alcoholic beverages for off-site consumptions had to apply for plan approval before rebuilding. (L.A. Mun. Code, § 12.24G.)[5]

On September 8, 1992, Kang filed an application pursuant to Los Angeles Municipal Code section 12.24G for plan approval. The Miyamoto application was filed the following month.

---

[2]Los Angeles Municipal Code section 12.24F provides in relevant part: "F. Existing Uses. Any lot or portion thereof being lawfully used for any of the purposes enumerated in this section at the time the property is first classified in a zone wherein such use is not permitted by right or at the time the use is prohibited by reason of an amendment to this article changing the permitted uses within the zone, shall be deemed to be approved site for such conditional use which may be continued thereon. Further, the conditions included in any special district ordinance, exception or variance which authorized such use shall also continue in effect."

[3]The Kangs are the owners of real property located at 4060 Buckingham Road, in South Central Los Angeles, upon which they operate a liquor store/mini-market.

[4]Miyamoto leases property at 5022 South Western Avenue, in South Central Los Angeles, upon which a liquor store/mini-market is operated.

[5]Los Angeles Municipal Code section 12.24G provides in relevant part: "1. Development of Site. On any lot or portion thereof on which a conditional use is permitted pursuant to the provisions of this section, new buildings or structures may be erected, enlargements may be made to existing buildings, existing uses may be extended on an approved site, and existing institutions or school developments may be expanded as permitted in Subsection F of this

The City's public counter staff recommended that the City Planning Commission[6] determine that the applications for plan approval filed by Kang and Miyamoto were "categorically exempt" from the provisions of the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)

The City Planning Commission held public hearings before a hearing examiner on the plan approval applications filed by Kang and Miyamoto, after which the commission determined that a categorical exemption was not permitted by CEQA, and directed the City Planning Department to prepare a proposed mitigated negative declaration (MND) for each application discussing the potential impact of the proposed liquor stores and mitigation measures to reduce the impact to insignificance.

Proposed MND's were prepared and circulated to the public, as required by CEQA. Thereafter, the proposed MND's and the plan approval applications came before the City Planning Commission. After discussion questioning its authority to require an environmental impact report (EIR) instead of MND's, the commission, on February 18, 1993, and June 17, 1993, respectively, adopted the MND's and conditionally approved Kang's and Miyamoto's applications.

On March 2, 1993, the city council asserted jurisdiction over the City Planning Commission's adoption of the MND and approval of Kang's application pursuant to Los Angeles City Charter, section 32.3.[7]

On March 23, 1993, the city council found that approval of Kang's liquor store application could have significant unmitigated adverse impact on the environment. Accordingly, the city council rescinded the action of the City Planning Commission and directed the City Planning Department to prepare

section, provided plans therefor are submitted to and approved by the Commission or by a Zoning Administrator, whichever has jurisdiction at that time. . . .

 ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 "Any person submitting development plans, or any other person aggrieved by a determination of the Director or his or her duly authorized representatives made relative to the approval or disapproval of a development plan may appeal said determination to the City Planning Commission. . . ."

 [6] The City Planning Commission is a City body created by the city charter and is the decision maker for applications for plan approvals filed under Los Angeles Municipal Code section 12.24G.

 [7] All references hereafter to "section" alone followed by the number 32.3 are to the Los Angeles City Charter.

an EIR prior to any further action being taken by the City Planning Commission on Kang's application for plan approval.[8]

On June 29, 1993, the city council asserted jurisdiction over the City Planning Commission's adoption of the MND and approval of Miyamoto's application pursuant to section 32.3, and on the same day found that approval of the liquor store application could have a significant unmitigated adverse impact on the environment. The city council rescinded the action of the City Planning Commission, and directed the City Planning Department to prepare an EIR prior to any further action being taken by the City Planning Commission on Miyamoto's application for plan approval. The matter was then returned to the City Planning Department for preparation of the EIR.

The City refused to commence preparation of the EIR's until Kang and Miyamoto paid certain preparation fees. Kang and Miyamoto refused to pay the fees, and filed in the superior court petitions for writ of mandate combined with complaints for damages under 42 United States Code section 1983. They claimed the City was preempted by the state Alcohol Beverage Control Act (Bus. & Prof. Code, § 23000 et seq.) from requiring them to apply for and obtain plan approvals under Los Angeles Municipal Code section 12.24G prior to rebuilding their liquor stores,[9] that CEQA did not apply to the approval of their applications because liquor stores do not impact the environment, and that even if CEQA did apply, they were entitled to a categorical exemption from CEQA and were not, therefore, required to submit either an MND or an EIR.

With respect to the city council's assumption of jurisdiction pursuant to section 32.3, Kang and Miyamoto claimed that the council's action in rescinding the City Planning Commission's approvals and requiring preparation of an EIR before the commission's further consideration of the applications did not constitute a "final action" within the meaning of section 32.3, and that the city council's action was, therefore, void. According to Kang and Miyamoto, the city council, upon assuming jurisdiction under

---

[8]The City Planning Department is charged with the preparation of EIR's.

[9]After Kang and Miyamoto filed their petitions for writ of mandate in the superior court, the KALAF decision became final. In that case, the court held that the City's ordinance imposing a plan approval process for the rebuilding of businesses destroyed or damaged during a civil disturbance and providing for revocation hearings as to businesses that had become or were threatening to become a nuisance or law enforcement problem was not expressly preempted by article XX, section 22 of the California Constitution (state shall have exclusive power to license and regulate the manufacture, sale, purchase, possession, and transportation of alcoholic beverages). (KALAF, supra, 23 Cal.App.4th at p. 390.)

section 32.3, was required to either grant, conditionally grant, or deny their plan approval applications.

Kang and Miyamoto urged the superior court to direct the City to rescind its requirement of an EIR and to promptly consider their project, and to consider the decision of the City Planning Commission to be final. They requested, alternatively, a writ of mandate vacating the decision of the City Planning Commission, and directing the City to promptly approve their applications, and to strike certain conditions of the approvals.

On October 19, 1994, the superior court issued minute orders granting the petitions for writ of mandate holding: (1) the city council's action requiring an EIR was not a "final action" within the meaning of section 32.3; (2) the City Planning Commission's action was final; (3) the City Planning Commission's findings were not adequate to support its decision; and (4) the plan approval process was not preempted by state law.

On December 20, 1994, the superior court issued peremptory writs of mandamus directing the City to set aside its actions taken pursuant to section 32.3, to set aside the City Planning Commission's actions with respect to the Kang and Miyamoto applications, and to "reconsider such actions in light of the [superior court's] ruling," and to "[a]dopt legally adequate findings."

The superior court directed preparation of a proposed statement of decision pursuant to Code of Civil Procedure section 632.[10] This petition for writ of mandate followed.

## II. CONTENTIONS

The City contends the orders granting the writs of mandate directing the City to set aside the actions of its city council taken pursuant to section 32.3 were erroneous as a matter of law, exceeded the superior court's jurisdiction and constituted an abuse of discretion because:

1) There was no factual basis for the court's conclusion that the city council failed to make a final decision on the matter before it.

2) Under section 32.3, the city council has the same authority to act on a matter as that held by the City Planning Commission. Since the commission could have directed preparation of an EIR prior to taking further action on

---

[10]On March 1, 1995, after this petition for writ of mandate was filed, the superior court executed statements of decision in both the Kang and Miyamoto cases.

the plan approval applications, the city council was entitled to take that same action.

3) The court failed to give any weight to the history of or administrative interpretation of section 32.3 by the City agencies responsible for its implementation.

4) The court failed to consider the legislative history of section 32.3 which indicates that it was to be given a broad, rather than a narrow, interpretation.

5) The court violated the rules of statutory construction and interpretation by implying a restriction on the city council's charter powers which was not expressly stated therein, in violation of the long-standing principle reiterated in *Domar Electric, Inc.* v. *City of Los Angeles* (1994) 9 Cal.4th 161 [36 Cal.Rptr.2d 521, 885 P.2d 934].

Kang and Miyamoto respond that the superior court properly interpreted section 32.3 because:

1) Section 32.3 requires a "final action" within 21 days on every matter over which the city council asserts jurisdiction thereunder, and the city council took no "final action" on the plan approval applications.

2) Use of section 32.3 by the city council to require either an EIR or a negative declaration where none was required below is inconsistent with CEQA.

3) The only ruling consistent with the plain language of section 32.3 and CEQA is that in asserting jurisdiction under section 32.3 over a project approval itself, the city council is bound by the City Planning Commission's decision to prepare a negative declaration.

### III. Discussion

Section 32.3 of the city charter was enacted by a vote of the people of Los Angeles on June 4, 1991. It provides as follows:

"Notwithstanding any other provisions of this Charter, actions of commissions and boards shall become final at the expiration of the next five (5) meeting days of the City Council during which the Council has convened in regular session, unless City Council acts within that time by two-thirds vote to bring such commission or board action before it for consideration and for whatever action, if any, it deems appropriate, except that as to any action of

the Board of Police Commissioners regarding the removal of the Chief of Police, the time period within which the Council may act before the action of such Board shall become final shall be ten (10) meeting days during which the Council has convened in regular session. If the Council asserts such jurisdiction, said commission or board will immediately transmit such action to the City Clerk for review by the Council and the particular action of the board or commission shall not be deemed final or approved. The City Clerk, upon receipt of such action, shall place the action on the next available Council agenda in accordance with applicable State law and Council Rules. If the Council asserts such jurisdiction over the action, it shall have the same authority to act on the matter as that originally held by the board or commission, but it must then act and make a final decision on the matter before the expiration of the next twenty-one (21) calendar days from voting to bring the matter before it, or the action of the commission or board shall become final. [¶] This section shall not apply to actions by any commission or board required to be referred for approval to, or appealable to, the Council pursuant to other provisions of this Charter . . . ."

The first issue to be resolved is exactly what action the city council took with respect to the plan approval applications. According to Kang and Miyamoto, the city council did not, as it asserts, rescind the City Planning Commission's determination to approve their applications. Kang contends that the city council did nothing more than place their plan approval application on "hold" until such time as the City Planning Department could commence and complete nuisance revocation proceedings. Miyamoto asserts the city council placed their application on "hold" until such time as an EIR could be prepared.

This argument was rejected by the superior court, as it should have been. The record reflects that Kang's application for plan approval was filed on September 8, 1992. On September 16, 1992, the City staff recommended an exemption of the project from CEQA. On October 26, 1992, the City Planning Department determined that further environmental review was required. On November 24, 1992, an initial study and checklist form was completed. On November 25, 1992, an MND was filed. On December 17, 1992, a hearing on the plan approval was held. On February 18, 1993, the City Planning Commission approved the application and the MND. On March 2, 1993, the city council voted to assert jurisdiction pursuant to section 32.3 over the City Planning Commission's action of February 18, 1993, and referred the matter to the city council's ad hoc committee on recovery and revitalization which was chaired by Councilman Mark Ridley-Thomas. The ad hoc committee recommended to the city council that a

further environmental review be made. On March 23, 1993, a hearing was held before the city council. A review of the transcript of that hearing reveals that the city council was concerned about its legal authority to deny a plan approval application outright. Thus, a discussion ensued as to what action would be appropriate. It was suggested that the city council rescind the City Planning Commission's action and hold the plan approval—in council—until a public nuisance revocation hearing could be commenced and completed. Later, a discussion ensued as to whether the city council had the authority to require an EIR. A council member who was against requiring Kang to obtain an EIR moved to rescind the City Planning Commission's action and hold the plan approval in council until such time as the revocation proceeding could be completed. He also asked the council to vote against requiring an EIR. The first part of his motion passed, but the second part did not. Thus, the city council initially voted to hold Kang's plan approval in council, and in the interim, instruct the City Planning Department to immediately initiate public nuisance revocation proceedings[11] for the commercial use, i.e., reconstruction of a liquor store. The record is also clear, however, that the city council voted to require Kang to obtain an EIR.

More importantly, the record demonstrates that while the city council may have considered "holding" Kang's application until a revocation hearing could be commenced and completed, that "decision" was later clarified by statements at the city council hearing indicating that the entire matter would "go forward" and be returned to the City Planning Commission for further action. We find significant the fact that in the Kang petition for writ of mandate, Kang claims that the action taken by the city council was to rescind the City Planning Commission's action of February 18, 1993, approving Kang's application. Additionally, the record reflects that the primary reason the applications filed by Kang and Miyamoto did not go forward was because they refused to pay the fees demanded by the City for preparation of the EIR's.

With respect to Miyamoto, the city council held no discussions concerning revocation proceedings. The council simply voted to rescind the City Planning Commission's approval of Miyamoto's application, and to require an EIR to be prepared and considered "prior to any further action on the application for plan approval on this property."

There is substantial evidence contained within the record to support the trial court's finding that the action the city council took with respect to the

[11] The record suggests that revocation proceedings may have been filed. The record is silent, however, as to the status of the proceedings.

Kang and Miyamoto applications was as follows: The city council first found as to both the Kang and Miyamoto applications that operation of a liquor store could cause an unmitigated significant adverse environmental impact on the surrounding community. The council then voted to revoke the City Planning Commission's adoption of the MND's, set aside the commission's grant of the applications, and directed preparation and consideration of an EIR prior to further action being taken by the City Planning Commission on the applications.

 Because there is substantial evidence to support the trial court's adoption of the City's characterization of the actions taken by the city council with respect to the Kang and Miyamoto applications, we now turn to the issue of whether the city council's action can be considered to be a "final action" within the meaning of section 32.3.

According to Kang and Miyamoto, the city council was required to either grant, conditionally grant, or deny their applications, and that any other action—including reversing the City Planning Commission's approval and requiring the preparation of an EIR—cannot be considered to be a "final action" taken with respect to their applications. We disagree.

 "The prime objective in interpreting a statute is to ascertain the intention of the enacting body so as to effectuate the purpose of the law. [Citations.]" (*Westfall* v. *Swoap* (1976) 58 Cal.App.3d 109, 113-114 [129 Cal.Rptr. 750].) The legislative history contained within the record is scant. It suggests, however, that section 32.3 was adopted in wake of the city council's frustration over a "multi-million dollar contract buyout" of the community redevelopment agency's general manager, and that in enacting section 32.3 the city council intended to increase its power to review decisions made by various City agencies. Kang and Miyamoto concede that this is so, but point out that "[t]here is absolutely nothing in the [legislative history] indicating that anyone had any thought of CEQA in the adoption of Section 32.3." A review of the documents submitted by the City shows this to be true. However, these writings also demonstrate that section 32.3 was enacted to give the city council the authority to review *all* types of decisions of its boards and commissions and to take "final action" on those matters over which it decides to assume jurisdiction. What the legislative history does not do, however, is assist this court in determining exactly what was meant by the term "final action."[12]

We turn, therefore, to the words of section 32.3, keeping in mind that "[w]here the words of the charter are clear, we may not add to or alter them

___

[12] The City contends that because the city council is the agency which drafted section 32.3, and because it is charged with enforcing the provision, the council's interpretation of the

to accomplish a purpose that does not appear on the face of the charter or from its legislative history. [Citation.]" (*Domar Electric, Inc.* v. *City of Los Angeles*, *supra*, 9 Cal.4th at p. 172.) We are required to accord the provision "a reasonable and commonsense interpretation avoiding absurd or impractical results" (*Dakin* v. *Department of Forestry & Fire Protection* (1993) 17 Cal.App.4th 681, 686 [21 Cal.Rptr.2d 490]), and to construe it "in favor of the exercise of the power over municipal affairs and 'against the existence of any limitation or restriction thereon which is not expressly stated in the charter. . . .' [Citations.]" (*Domar Electric, Inc.* v. *City of Los Angeles*, *supra*, at p. 171.)

Applying these principles, we conclude that section 32.3 conveys a broad grant of power to review all types of decisions of its boards and commissions, whatever "such Commission or Board actions" may be, and to take "whatever action" the city council "deems appropriate." The language of the provision is susceptible to but one interpretation, i.e., that the city council is permitted to assert jurisdiction over interim decisions of the City Planning Commission, including the commission's decision as to what type of environmental document is required to be filed prior to the approval of a plan approval application.

The superior court ignored the broad language of section 32.3 and read into it a limitation not warranted by its terms. Nothing contained within section 32.3 suggests that the city council, once it has assumed jurisdiction over a decision made by the City Planning Commission, is restricted to granting, conditionally granting, or denying a land use or any other type of application.

Section 32.3 specifically provides that the council "shall have the same authority to act on the matter as that originally held by the board or commission." This means that the only substantive limitation on council authority is any inherent limitation on the commission action itself. City boards and commissions take many actions not necessarily involving "approving" a permit. Thus, the action taken by the council need not be "final" as it relates to the subject matter of the item for consideration (in the sense of an approval or denial of a permit for example). Rather, the council must make a final decision on "whatever action, if any, it deems appropriate." The procedural limitation is that the city council "must then act and make a final decision on the matter before" the expiration of 21 days after asserting

statute is entitled to great deference. We believe, however, that this rule is applicable only where there has been a consistent administrative construction of a statute over many years. (See *Thornton* v. *Carlson* (1992) 4 Cal.App.4th 1249, 1256-1257 [6 Cal.Rptr.2d 375].)

jurisdiction. Thus, the only "final decision" the city council must make is on the matter before the council, whatever category of "matter" that may be—advice, recommendation, approval, denial or some other decision relating to the myriad of matters within the jurisdiction of the City Planning Commission.

None of the parties has cited a case directly on point. However, we find support for our conclusion that the city council's action constituted a "final action" within the meaning of section 32.3 in *Carmel Valley View, Ltd.* v. *Maggini* (1979) 91 Cal.App.3d 318 [155 Cal.Rptr. 208] (*Carmel Valley*). In Monterey County, when approval of a tentative subdivision map is sought, the map is submitted to the planning department, which then distributes the map to the subdivision committee, which reports on the map to the planning commission. Once a tentative map is filed with the planning commission, the commission has 50 days to act on the map. The next step is for the map and the commission's written report to be forwarded to the board of supervisors, who either grant or deny approval. In the *Carmel Valley* case, a limited partnership which owned land in Monterey County sought approval of a tentative subdivision map for a parcel of land. The planning commission voted to refer the map to the board of supervisors with the recommendation that an EIR be prepared. (*Id.* at p. 321.) According to ordinance, the board of supervisors was required to "approve, conditionally approve, or disapprove," the map. Instead, the board requested a supplemental EIR (because the partnership had submitted an EIR in connection with a previous application). The court held that this action was permissible because, although the board of supervisors did not expressly approve, conditionally approve, or disapprove the map, in requesting a supplemental EIR the board "effectively placed [the partnership] on notice that its map would be disapproved unless [it] provided the supplemental information." (*Id.* at p. 323.) The board's decision to return the application to a lower body for preparation of an EIR prior to further consideration of the application by the board was an implied disapproval of the map absent submission of additional information. (*Ibid.*)

*Carmel Valley* is, of course, factually distinguishable since the requirements for acquiring a tentative subdivision map are set forth in specific terms within the statute, and the steps differ from those Kang and Miyamoto were required to take in securing approval of their application. The case does, however, strongly suggest that governmental bodies such as the city council in the instant case are not limited to either granting or denying an individual's application for plan approval—that other "final" dispositions are possible.

We next consider whether, as Kang and Miyamoto contend, that the use of section 32.3 by the city council to "belatedly require either an EIR or a negative declaration is inconsistent with CEQA."

CEQA requires the lead agency to determine whether to prepare an EIR or a negative declaration, or whether the project is exempt within 30 days after the application is deemed completed. (Pub. Resources Code, § 21080.2 [provides that determination of whether an EIR is required "shall be made within 30 days from the date on which an application for a project has been received and accepted as complete by the lead agency"].) According to Kang and Miyamoto, the 30-day time limit "expired long before the city council assumed jurisdiction" over their plan approval applications.

The argument set forth by Kang and Miyamoto is premised upon their conclusion that section 32.3 required the city council to grant, conditionally grant, or deny their plan approval applications. They contend, in essence, that in order to comply with the requirements of CEQA, the city council should have asserted jurisdiction over the City Planning Commission's initial decision to order preparation of an MND—that the council was not allowed to wait until the MND was "adopted." Preparation of a final MND requires public circulation, which, as Kang and Miyamoto point out, cannot be completed within the 21-day period required by section 32.3 for the city council to act. If the City had asserted jurisdiction over the City Planning Commission's initial decision to draft an MND, it could not have approved or disapproved the application and thus would not have been able to meet the interpretation of the "final action" requirement of section 32.3 advanced by Kang and Miyamoto.

Kang and Miyamoto also contend that their projects are categorically exempt from CEQA, and, alternatively, that their projects create no significant environmental effects and therefore the requirement of an EIR was improper.

To the extent Kang and Miyamoto contend that the merits of these issues should be resolved in connection with this petition, we decline the invitation. First, it is clear from the statements of decision, the trial court's minute orders, and the trial transcript that the superior court did not reach these issues. This being so, any decision this court might render with respect to these issues would be advisory only, and thus improper.

Moreover, even if we were inclined to review these issues, we would be unable to do so since the record here is incomplete. ■ Any decision on the merits of a CEQA challenge necessarily involves reviewing the City's entire administrative record to determine whether substantial evidence exists to support its decision to reject a categorical exemption and to require an EIR. (Pub. Resources Code, §§ 21168, 21168.5; *No Oil, Inc.* v. *City of Los*

*Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66]; *Dunn-Edwards Corp.* v. *Bay Area Air Quality Management Dist.* (1992) 9 Cal.App.4th 644, 656 [11 Cal.Rptr.2d 850]; *Meridian Ocean Systems, Inc.* v. *State Lands Com.* (1990) 222 Cal.App.3d 153, 169-170 [271 Cal.Rptr. 445].) Neither the City nor Kang or Miyamoto have provided the complete record of the administrative proceedings to this court.

 We conclude that the city council's action in rescinding the action of the City Planning Commission and directing the City Planning Department to prepare an EIR prior to any further action by the City Planning Commission on the plan approval applications submitted by Kang and Miyamoto constituted a "final decision" within the meaning of section 32.3.

Accordingly, the superior court is directed to set aside its orders issuing peremptory writs of mandate to Kang and Miyamoto, and to conduct further proceedings in accordance with this opinion. The temporary stay imposed on May 17, 1995, is vacated.

Boren, P. J., and Nott, J., concurred.

A petition for a rehearing was denied November 9, 1995, and the petition of real parties in interest for review by the Supreme Court was denied February 15, 1996.