[No. B044023. Second Dist., Div. Seven. Feb. 20, 1991.]

SECURITY ENVIRONMENTAL SYSTEMS, INC., et al., Plaintiffs and Appellants, v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT et al., Defendants and Appellants.

114

**COUNSEL**

Straw & Gilmartin, Lawrence J. Straw, Jr., and Paul T. Gough for Plaintiffs and Appellants.

Ronald A. Zumbrun and Robin L. Rivett as Amici Curiai on behalf of Plaintiffs and Appellants.

Diana A. Love, William B. Wong, Peter M. Greenwald and Barbara Baird for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Susan L. Durbin, Deputy Attorney General, Joel R. Reynolds and Lisa Foster as Amici Curiae on behalf of Defendants and Appellants.

OPINION

KALIN, J.*—

INTRODUCTION

On December 11, 1985, the plaintiffs, Security Environmental Systems, Inc., and its wholly owned subsidiary, California Thermal Treatment Service, Inc., submitted applications for South Coast Air Quality Management District permits to construct (permits) the first hazardous waste incineration facility in the State of California. The incinerator would burn up to 125,000 pounds of hazardous waste per day, emitting up to 83,000 cubic feet of hot gases per minute resulting in 19,000 tons of hazardous waste ash each year.

On February 18, 1987, the South Coast Air Quality Management District (the District) issued the 21 requested permits to construct the facility in Vernon, California. Printed on each permit was the condition that the permit would expire on February 1, 1988, and further that an extension "may be granted upon written request to the Executive Officer" of the District. By letter dated January 7, 1988, the executive officer extended the 21 permits until February 1, 1989.

Thereafter on December 16, 1988, Security Environmental Systems, Inc. (SES),[1] requested an additional extension of the 21 permits to February 1, 1990. In reply, by letter of December 23, 1988, the District advised SES that the permits would be extended only if the following prerequisites were met:

1. An environmental impact report (EIR) be prepared;

---

* Assigned by the Chairperson of the Judicial Council.
[1] Abbreviated references in text:
BACT—Best Available Control Technology
CARB—California Air Resources Board
CEQA—California Environmental Quality Act
District—South Coast Air Quality Management District
DOHS—California Department of Health Services
EIR—Environmental Impact Report
EPA—Environmental Protection Agency
HRA—Health Risk Assessment
NOX—Nitrogen oxide
PEA—Preliminary Environmental Assessment
Permits—South Coast Air Quality Management District permits to construct
RCRA—Resource Conservation and Recovery Act
SCR—Selective Catalytic Reduction
SES—Security Environmental Systems, Inc.

2. Demonstration that the project conforms with present District best available control technology (BACT); and

3. A revised and updated health risk assessment (HRA) based upon the latest and most up-to-date information be completed.

SES sought a writ of mandate from the Los Angeles Superior Court requiring the District and its executive officer, James Lents, to extend the twenty-one permits to construct the hazardous waste incinerator without the imposition of the three conditions for a period of one year. The trial court ordered the permits extended without the necessity of an EIR or an HRA but did require SES to comply with the current BACT.

The District has appealed the trial court's extension of the 21 permits and the elimination of the conditions requiring an EIR and an updated HRA. SES appeals from that portion of the final judgment of the trial court requiring it to submit to the condition to install current District BACT.

FACTS

SES initially approached the District in February 1985 with the idea of constructing California's first full-scale hazardous waste incinerator to be capable of burning two tons of waste per hour including paint thinner, benzene, toluene, petroleum fuels, freons, trichloroethane, pesticides, alcohols, acetone, waste and mixed oil, oil/water separation sludge, tank bottom waste, degreasing sludge and paint sludge, eventually listing four hundred and fifty-eight chemicals.

In June 1985, it was determined that the District would serve as the "lead agency"[2] for purposes of compliance by SES with the California Environmental Quality Act (CEQA), Public Resources Code section 21000 et seq. SES understood that a number of permits would be required for the project from various governmental agencies. In August 1985 SES submitted a preliminary environmental assessment (PEA) to the District; the PEA was found to be deficient. On September 17, 1985, the District made the decision that an EIR would be required as the District was concerned with anticipated dioxin and furans emissions and the probability of public controversy.

A revised PEA submitted to the District in October 1985 was also found to be deficient. Because of the belief of a potentially significant cancer risk

---

[2] Public Resources Code section 21067 provides that the lead agency is the public agency with principal responsibility for carrying out or approving a project which may have a significant effect upon the environment.

from the project, the District determined that an HRA should be prepared. On December 6, 1985, SES agreed to prepare an HRA. On December 7, 1985, the District published a notice of intent to file a negative declaration for the proposed hazardous waste project. Public Resources Code section 21064 states, "'Negative declaration' means a written statement briefly describing the reasons a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report."

On December 11, 1985, SES filed application with the District for 23 operating permits stating construction would be completed within 1 year. A draft HRA submitted to the District on December 23, 1985, was found to be deficient by the District, the California Environmental Health Office and the California Department of Health Services (DOHS). Over the period of the next several months SES and the District had several discussions, the District requesting additional information.

In March 1986, SES requested the District to issue a negative declaration before its completion of the HRA. On March 20, 1986, the District, DOHS and SES discussed various deficiencies still remaining in the draft HRA. On May 22, 1986, the District requested information and emission calculations from SES.

Based upon assumptions and estimates of various emissions provided by SES and from information then available, on February 1, 1987, the District approved a negative declaration finding the proposed project would not have a significant effect upon the environment. The District later believed these assumptions and estimates were greatly underestimated and subsequently requested a reevaluation of the data.

On February 18, 1987, the District issued 21 permits to SES with various conditions including a provision prohibiting commencement of construction without prior written approval of the final specifications and drawings by the District. This approval has never been given. Each permit specified that it would expire on February 1, 1988; the permits further provided that an extension may be granted upon written request to the executive officer of the District.

Thereafter, SES pursued various permits and approvals: from the City of Vernon, a conditional use permit and building permit; from DOHS, a hazardous waste facility permit; and from the Environmental Protection Agency (EPA), a resource conservation and recovery act permit (RCRA). On December 22, 1987, SES requested of the District, and was subsequently

granted, an extension of its 21 permits for a period of 1 year only, to February 1, 1989. SES was told it was unlikely that it would receive any further extensions of the permits. On March 17, 1987, the City of Vernon issued a conditional use permit, but it has not issued a building permit to SES. On September 8, 1988, DOHS issued to SES the required hazardous waste facility permit and the EPA issued the required RCRA permit which did not become effective until April 10, 1989.

On December 16, 1988, SES formally requested an additional one-year extension of the twenty-one District permits. On December 23, 1988, James Lents, executive officer of the District officially notified SES that the 21 permits would expire on February 1, 1989, unless SES agreed to the imposition of 3 conditions, namely:

1. The proposed air pollution control equipment must be upgraded to conform to current District BACT;

2. A revised and updated HRA based upon the latest and most up-to-date information must be prepared; and

3. An EIR must be prepared by an independent contractor at the applicant's expense.

In imposing the conditions the District indicated the following reasons for refusing to unconditionally extend the permits:

1. Since the approval of the negative declaration on February 1, 1987, evidence has mounted against the District's previous assumption of insignificant emissions of dioxins and forans. The California Air Resources Board (CARB) has published four reports demonstrating dioxin and furan emission factors up to twelve thousand five hundred times higher than was presumed by the District. Other information indicated the emissions would be from 100 to 1,000 times greater than the assumptions upon which the negative declaration was based. If the new information is correct this would place the cancer risk above the District's threshold of significance. The negative declaration was based upon the assumption that toxic air contaminants, emissions and additional cancer risk would be insignificant; now these matters would be much more significant.

2. The District became aware of technological advances of air pollution control equipment that achieved levels of control of particulates five times greater than that provided by SES's proposed control equipment.

3. The District learned of equipment to achieve a greater level of control of sulfur oxides, acid gases which are precursors to the formation of particulates. The equipment being a spray dryer/baghouse combination. A Canadian study indicates this system would reduce dioxins and furans by over 99 percent and would reduce nitrogen oxide (NOX) emissions by 45 pounds per day.

4. Additionally the District learned that the cost of catalyst for an NOX selective catalytic reduction (SCR) emission control unit was substantially less expensive than previously determined, thus making SCR cost effective for hazardous waste incinerators. This information was obtained from a presentation by Mitsubishi to the District in October 1988.

SES refused to accept the three conditions requested by the District for the extension of the permits, stating that the required review would necessitate virtually starting anew with all the permitting agencies. On December 23, 1988, the executive officer of the District formally denied the 21 permits. On January 24, 1989, SES filed a petition for a writ of mandate with the Los Angeles Superior Court seeking an extension of the 21 permits without imposition of the 3 conditions.

On July 13, 1989, pursuant to Code of Civil Procedure sections 1085 and 1087, the court issued a peremptory writ of mandate commanding the District to immediately extend SES's 21 permits without the conditions requiring an EIR or an updated HRA. The extension of the 21 permits to construct the facility by SES was made subject to a condition requiring the installation of current BACT equipment as defined by District rules and regulations on SES's hazardous waste incinerator.

## DISCUSSION

*SES did not acquire a vested right in the 21 permits and any extension of the permits or denial of an extension was within the discretion of the District.*

The 21 permits issued by the District on February 18, 1987, contain the following language:

"1. Final Design Specifications and Drawings for this Equipment Shall be Submitted by SES and Must be Approved by the Executive Officer in Writing Prior to Construction.

"2. This permit to construct is valid until February 1, 1988. An extension may be granted upon written request to the executive officer. The concluding paragraph of the permits state as follows:

"This permit to construct shall expire two years from the date of filing of application unless an extension is granted by the executive officer."

SES was unable to commence construction by February 1, 1988, the expiration date of the permits, in that it had not acquired all of the necessary discretionary permits from other governmental agencies: the City of Vernon, the DOHS and the EPA. Also as of February 1, 1988, the final design specifications and drawings required by the permits submitted to the District were not complete in that they were subject to vendor selection and further engineering work by SES. The permits required finished design specifications and drawings approved by the executive officer of the District.

SES was aware the permits would expire on February 1, 1988, and on December 22, 1987, requested a one-year extension of the permits from the District. On January 7, 1988, the District extended the permits to February 1, 1989, but advised SES that it was unlikely that the permits would be extended beyond that date. By letter of January 7, 1988, the District informed SES that it had failed to provide the District with the specific origin (generator) of the chemicals proposed for incineration and to justify that the proposed facility could safely accept and adequately incinerate the waste material and handle the waste residue including those chemicals not identified in the permits.

SES is unable to cite any code, regulation or law which requires a mandatory extension of the permits by the District. The District exercised its discretion to extend the permits for an additional year to allow SES the additional time to comply with the requirements of the various governmental agencies and formulate its final design specifications and drawings for District approval. During the ensuing several months SES obtained a permit from DOHS but its RCRA permit did not become effective until April 10, 1989, after the District permits had expired on February 1, 1989.

On December 13, 1988, the District notified SES that it still had not complied with the conditions of the permits in that the District had not been provided the list of waste materials and their respective generators nor had SES provided the final design specifications and drawings for approval by the executive officer.

SES concedes it was unable to commence construction by the February 1, 1989, expiration date of the extended permits. On December 16, 1988, SES formally requested an additional one-year extension. Hereinafter will be discussed the case law, statutes and regulations by which SES alleges it

acquired vested rights in the permits and the further theory by SES that the District is estopped from denying an extension of the permits.

■ However, unless SES can find some salvation in case law or estoppel, when it is determined that SES has not complied with the language of the permits as to securing all discretionary approvals and final approval of its specifications and drawings by the District, then the District has the discretion to extend or terminate the permits. By letter of January 31, 1989, SES was notified that the permits would be terminated February 1, 1989, in that SES still had not completed and submitted the final design and engineering specifications. Prior to the letter of termination the District did offer to extend the permits if, due to the new information, SES would have an EIR prepared, and an updated HRA prepared and the air pollution equipment upgraded to conform to BACT. SES refused to comply with these requests.

On February 1, 1987, the District had made a finding that the project would not have a significant effect upon the environment and that the equipment complied with BACT resulting in the filing of a negative declaration and obviating the necessity of an EIR. An environmental impact report is a detailed informational document setting forth such matters as the significant environmental effects of a proposed project, any significant environmental effects which cannot be avoided if the project is implemented, mitigation measures proposed to minimize the significant environmental effects and alternatives to the proposed project. (Pub. Resources Code, § 21061.)

By making those determinations resulting in the issuance of the negative declaration SES and the District made certain assumptions regarding the amounts and nature of the pollutants which would be emitted into the south coast air basin by the project. These assumptions were based upon the limited data available at said time, realizing there were no hazardous waste incinerators operating in California from which to obtain hard data.

Known pollutants which would be emitted into the air basin were toxic air contaminants, such as: dioxin and furans which are chlorinated hydrocarbon compounds which are known to cause cancer, oxides of nitrogen which impair breathing and lower resistance to respiratory disease and which combined with sunlight form ozone, and hydrocarbons which combined with nitrogen form ozone and fine particulate matter which when inhaled into the lungs can cause health damage.

It is the amount of these pollutants, not their existence, which is disputed by the parties and forms the controversy upon which the District predicates the need for an EIR and an updated HRA.

SES, since the inception of its application to construct a hazardous waste incinerator, has performed various studies, leased land, signed contracts and made various and substantial expenditures in pursuing the necessary approvals and permits to construct and operate the facility. Faced with the conditions imposed by the District requiring an updated HRA, an EIR and conformance with current BACT requirements, SES urges that its actions, expenditures and reliance on the original permits has jelled into a vested right to construct the facility based upon the original permits issued by the District on February 18, 1987. It urges that to hold otherwise would be to place SES in a continuous, never-ending permit application process.

Section 21166 of the Public Resources Code limits the lead agency (the District) from requiring a subsequent or supplemental EIR except under limited factual situations.

Public Resource Code section 21166: "[w]hen an environmental impact report has been prepared for a project pursuant to this division no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

". . . . . . . . . . . . . . . . . . . .

"(c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

■ The District states that Public Resources Code section 21166 is inapplicable herein in that the District filed a negative declaration and did not originally require an EIR, and only when there has been a prior EIR prepared is the District precluded from requiring a subsequent or supplemental EIR based upon new information. Thus an initial EIR can be required without the restrictions imposed by section 21166, notwithstanding a prior negative declaration. It is readily apparent from a reading of the code section that there is no mention of negative declarations.

California Code of Regulations, title 14, section 15162, subdivision (a)(3), set forth in the footnote,[3] was promulgated to implement Public Resources

---

[3] Section 15162 states:
"(a) Where an EIR or negative declaration has been prepared, no additional EIR need be prepared unless:
". . . . . . . . . . . . . . . . . . . .
"(3) New information of substantial importance to the project becomes available, and

Code section 21166 by specifying the nature of the new information. The regulation also includes a provision which expands Public Resources Code section 21166 to include a prior negative declaration: "(a) Where an EIR or negative declaration has been prepared, no additional EIR need be prepared unless . . . ." The question presented is whether the CEQA guidelines are regulatory mandates or only aids in interpreting the statute. An administrative agency may adopt supplementary regulations if they are reasonably related to the purposes of the act. (*Soderling* v. *City of Santa Monica* (1983) 142 Cal.App.3d 501, 506 [191 Cal.Rptr. 140].) CEQA guidelines are binding on public agencies. (*San Francisco for Reasonable Growth* v. *City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1512-1513 [258 Cal.Rptr. 267].)

In the case of *Benton* v. *Board of Supervisors* (1991) 226 Cal.App.3d 1467 [277 Cal.Rptr. 481], the board of supervisors had approved a mitigated negative declaration for the construction of a winery. Subsequently, Whitbread of California acquired an adjoining 120 acres and requested another use permit seeking to relocate the winery on the enlarged site and reducing the size of the winery buildings. The board approved the new use permit. The appellants sought to compel the county to require the preparation of an EIR stating that CEQA required an EIR due to the relocation of the winery and to disregard the original negative declaration. The court held that California Code of Regulations, title 14, section 15162 is valid when applied to cases in which an initial negative declaration was adopted. That the movement of the winery did not require a new EIR, that it was a modification of the original use permit and under section 15162 would require a showing of significant effects upon the environment not discussed previously in the negative declaration. "If a limited review of a modified project is proper when the initial environmental document was an EIR, it stands to reason that no greater review should be required of a project that initially raised so few environmental questions that an EIR was not re-

"(A) The information was not known and could not have been known at the time the previous EIR was certified as complete or the negative declaration was adopted, and

"(B) The new information shows any of the following:

"1. The project will have one or more significant effects not discussed previously in the EIR;

"2. Significant effects previously examined will be substantially more severe than shown in the EIR;

"3. Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project; or

"4. Mitigation measures or alternatives which were not previously considered in the EIR would substantially lessen one or more significant effects on the environment.

"(b) If the EIR or negative declaration has been completed but the project has not yet been approved, the lead agency shall prepare or cause to be prepared the subsequent EIR before approving the project."

quired, but a negative declaration was found to satisfy the environmental review requirements of CEQA. To interpret CEQA as requiring a greater level of review for a modification of a project on which a negative declaration has been adopted and a lesser degree of review of a modified project on which an EIR was initially required would be absurd." (*Benton, supra*, 226 Cal.App.3d at p. 1480, italics omitted.)

Thus the District having adopted a negative declaration on the project cannot require SES to prepare an EIR pursuant to Public Resources Code section 21166 unless there is "new information" which was not known and could not have been known at the time the negative declaration was adopted.

The District does not rely on any single piece of "new information" to reach its conclusion that the SES project would potentially emit significant amounts of toxic emissions. As a result of an accumulation of information from various sources over a period of time the District became concerned with the possibility of a substantially higher risk to the health of the persons who would be subject to the emissions from the hazardous waste incinerator. The "new information" included CARB source test reports and an EPA cosponsored conference on hospital waste incinerators. These reports and the conference demonstrated that potential emissions of dioxins and furans may be much higher than the amounts previously assumed by the District, indeed possibly as much as 12,500 times higher.

Since the original negative declaration was based upon assumptions and not hard data, the new assumptions raise substantial concern as to the validity of the original data, and strongly suggest the need for a reconciliation of adverse assumptions and a full and complete investigation and disclosure of all health hazards. If the emissions were substantially higher there would be a much more significant cancer risk associated with the proposed incinerator than previously assumed. This information and the associated substantially increased risk would meet the criteria set forth in California Code of Regulations, title 14, section 15162, subdivision (a)(3)(B)(1) and (2).

Additionally, under California Code of Regulations, title 14, section 15162, subdivision (a)(3)(B)(3) and (4) mitigation measures and alternatives not previously considered in the negative declaration would substantially lessen one or more significant effects upon the environment. The BACT has progressed since the original permits and new information is available in the form of technology for controlling acid gases, particulates and their associated dioxins and furans. It has further been determined that a previously known SCR NOX control system is cost effective now due to new informa-

tion, thus qualifying its use on hazardous waste incinerators as technologically feasible BACT.

Thus the new information raising the possibility of substantially increased health risk and the availability of new emission control technology which may lessen that risk require an EIR to set forth the present significant environmental effects of the proposed project and any mitigating measures to minimize the significant environmental effects and alternatives to the proposed project.

As previously discussed the permits required SES to submit to the District the final design specifications and drawings for approval. At all times prior to the expiration of the permits these documents were not submitted and thus design and drawing approval was not given and the project was not approved. California Code of Regulations, title 14, section 15162, subdivision (b) states: "If the EIR or negative declaration has been completed but the project has not yet been approved, the lead agency shall prepare or cause to be prepared the subsequent EIR before approving the project." Under section 15162, subdivision (b) even if a new EIR would not be required, a supplemental EIR shall be prepared to consider the new information and technology.

The 21 permits issued were for various machinery and equipment. ■ SES claims a vested right to an extension of the permits and the right to commence construction based upon the specifications set forth in the original permits, alleging that for a period of five years the District cannot require any changes or require the substitution or modification of any equipment even if new or advanced technology might substantially lessen the environmental impact of the project. This being based upon the issuance of the permits within the window period of Health and Safety Code section 42301.5, subdivision (a): "Except as provided in subdivision (b), any district regulation which requires a reduction in emissions from any article, machine, equipment, or contrivance for which an authority to construct was issued between January 1, 1981, and December 31, 1987, inclusive, shall become effective for that article, machine, equipment, or contrivance five years after issuance of the permit to operate if the regulation was adopted after issuance of the authority to construct and construction has commenced within two years of the date of issuance of the authority to construct or the applicant has, in good faith reliance upon the permit issued, performed substantial work or incurred substantial liability."

Since construction was not commenced on the project within two years of the date of authority to construct (the issuance of the permits) it would be necessary for SES to show that it has in good faith relied upon the permits and performed substantial work or incurred substantial liability.

After issuance of the permits SES contracted with Combustion Engineering to construct a turnkey operation of the facility, conditional upon governmental approvals. Additional expenses consisted of $600,000 plus to Environmental Audit, Inc., for permitting and design, $28,000 to West Coast Analytical Labs for lab work, a $150,000 deposit with the City of Vernon and $370,000 for miscellaneous work on the land site for partial demolition of an existing building and the removal of an old water main and well. SES also arranged for the commitment of $29 million in bonds from the California Pollution Control Financing Authority.

*SES Did Not Acquire Vested Rights in the Permits in That There Was No Good Faith Reliance by SES on a Complete Set of Discretionary Permits Prior to Incurring Substantial Liability.*

In the case of *Avco Community Developers, Inc.* v. *South Coast Regional Commission* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546], Avco performed a number of studies for the development of a housing tract in Laguna Niguel and proceeded to subdivide and grade the property pursuant to approvals issued by the county. Avco completed or was in the process of constructing storm drains, culverts, street improvements, utilities and other similar facilities for the tract. Under county laws a building permit could not be obtained until the grading had been completed. Effective February 1, 1973, the coastal zone conservation act (Pub. Resources Code, § 27000 et seq.) became effective requiring a permit from said commission. On February 1, 1973, the rough grading had not been completed nor had Avco submitted building plans for the tract to obtain a permit from the county to construct the structures. To that point Avco had spent $2,082,070 and incurred additional liabilities of $740,468 with further daily losses being incurred in the amount of $7,000 plus per day.

Avco claimed the right to proceed with construction after February 1, 1973, stating it had acquired a vested right by having secured a building permit for grading and in good faith performed substantial work in reliance thereon, diligently commenced construction, and incurred substantial liabilities. The Supreme Court held that Avco had not acquired a vested right to proceed with construction of the buildings despite its expenditure of in excess of $2 million because it had not acquired all of the necessary permits as of February 1, 1973.

The court relied on *Spindler Realty Corp.* v. *Monning* (1966) 243 Cal.App.2d 255 [53 Cal.Rptr. 7], and *Anderson* v. *City Council* (1964) 229 Cal.App.2d 79 [40 Cal.Rptr. 41]. In *Spindler,* the builder had obtained a grading permit and other approvals from the City of Los Angeles. The

permit did not refer to the number and size or type of buildings to be erected on the site, although it was known and understood the buildings would be multiple-unit buildings. Spindler spent over $300,000 in development costs; however, before the building plans were approved, the property was rezoned from multiple- to single-family residential. The court held that Spindler had a vested right to complete the grading but not to build the structures allowed by the prior zoning. The court stated, "although Spindler had proceeded in good faith for two years to complete its engineering and architectural plans for the apartment house complex in reliance on multiple residential zoning and the authorizations granted by the City, Spindler was taking a calculated risk in continuing its preparations at least from the time it learned, prior to completion of grading, that the city was rezoning the property."

In the *Anderson* case (229 Cal.App.2d at p. 89) the plaintiffs purchased a lot upon which to build a service station. Thereafter the city changed the zoning, requiring a special permit for construction. Plaintiffs asserted that the property was purchased upon assurances by city officials that construction of a service station was permitted, and plaintiffs had spent sums for preliminary development costs. The *Anderson* court held that since all of the landowners' acts had occurred prior to the issuance of the building permit they could not have acted in reliance upon such a permit, and therefore could not have acquired vested rights in reliance thereon. "Where no such permit has been issued, it is difficult to conceive of any basis for such estoppel."

SES's reliance on the vested rights doctrine is inconsistent with the evidence. SES could only claim vested rights to build the incinerator free of the conditions imposed by the District if it had secured all of the discretionary permits and approvals and had expended substantial sums in reliance upon those permits. All of the permits were time limited on their faces, stating not once, but twice that they would expire on a certain date but in any event within two years of their issuance. Any extension was discretionary by the executive officer; the language stating "he may" extend the permits. There is no language in the permits which states he shall or must extend the permits. The District never represented that it would extend the permits but pointed out to SES that the permits might not be extended.

As previously discussed SES had failed to provide the District with the final specifications and drawing prior to the expiration of the permits. Without the approval of the final design specifications and drawings SES had no vested right to commence construction until the discretionary approval of the final design specifications. Nor had SES obtained all of the necessary

discretionary approvals from other governmental agencies in that the permit from the EPA was not effective until April 10, 1989. All funds spent prior to the issuance of the EPA permit were made with full knowledge that SES did not have permission to proceed with the project and that said permission was discretionary and might be denied or conditioned upon further changes to the project.

The expenditures made by SES preparatory to approval of the project related to design and obtaining permits, not money actually spent constructing a permitted project. Preparatory costs do not give rise to vested rights. (*Halaco Engineering Co.* v. *South Central Cost Record Commission* (1986) 42 Cal.3d 52, 73 [227 Cal.Rptr. 667, 720 P.2d 15].) "Preparatory work will not give rise to a vested right, however, when it is done with knowledge that one or more additional permits will be required for actual construction. The government may apply the laws acutally in effect at the time the additional permits are sought." (*Ibid.*)

### *The District Is Not Estopped From Denying an Extension of the Permits to SES*

■ Equitable estoppel is founded upon the concepts of equity and fair dealing. The elements of equitable estoppel are: (1) The party to be estopped must be apprised of the facts; (2) it must intend that its conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of the facts; and (4) it must rely upon the conduct to its injury. (See *Robert S. Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264].)

■ The District at no time promised SES that it would extend the permits but advised SES that it was unlikely that the permits would be extended. The facts do not show any conduct by the District upon which SES could have reasonably relied to support a belief that the permits would be extended each time such an application was to be made. To impose a duty upon the District to extend the permits would encase the permits in a state of perpetuity until SES at some future date exercised its decision to commence construction. A governmental agency under this reasoning would be unable to place a termination date on permits which it issued.

In that the costs were incurred by SES before obtaining the final permits, the expenditures do not give rise to a vested right to continue construction; SES took a calculated risk by expending funds to obtain permits to build a hazardous waste incinerator in a densely urbanized and highly polluted

area. It is difficult to envision an estoppel when the District never represented that the permits would be extended and SES went forward spending money knowing it did not have final permits. ■ Having concluded that the District had no statutory duty to extend the permits, that SES did not have vested rights in the permits and further that the District is not estopped from cancelling the permits, the District thus can require an EIR and an updated HRA as a condition of extending the permits.

CEQA, Public Resources Code section 21000 et seq., requires preparation of an EIR under the following circumstances: "[I]f a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect." (Cal. Code Regs., tit. 14, § 15064, subd. (g); see *Friends of B Street* v. *City of Haywood* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514]; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66].)

In the recent case of *Meridian Ocean Systems, Inc.* v. *California State Lands Commission* (1990) 222 Cal.App.3d 153, 164-165 [271 Cal.Rptr. 445], the court held that the commission had properly ordered preparation of an EIR despite a previously granted exemption for marine geophysical surveys, where there was subsequently discovered substantial evidence of a reasonable possibility of a substantial adverse effect on the environment. Factually, the petitioners (Meridian et al.) were using compressed air and water devices released under the water to generate acoustic pulse signals to map the ocean floor; this procedure had been in use since 1967 with appropriate permits. The opponents to the testing argued that the tests conducted during the spawning period could result in a reduction in the fish population and could cause the fish to leave their normal feeding areas and deviate from their normal behavior patterns. The petitioners argued that there was insufficient evidence to support the commission's order for the preparation of an EIR. Quoting *Lewis* v. *Seventeenth District Agricultural Association* (1985) 165 Cal.App.3d 823 [211 Cal.Rptr. 884], the court stated: "Invoking an exception to a categorically exempt activity necessitates a decision whether there is a '. . . *possibility* of a significant effect on the environment which is at issue, not a determination of the actual effect, which would be the subject of a negative declaration or an EIR.' " (*Meridian Ocean Systems, Inc., supra*, 222 Cal.App.3d at p. 164.) "Inherent in the commission's power to issue permits is the ability to re-evaluate the conditions surrounding their issuance as warranted by changing circumstances." (*Id.* at p. 165.)

The American Heritage Dictionary (2d college ed.) defines "possible" as follows: "Possibly indicates that something is realizable as an end. It can

imply either a moderate degree of probability or the barest chance within the limits of circumstances."

The District has challenged the assumptions resulting in the original negative declaration and urges that there is a probability there will be a substantially greater amount of hazardous emissions from the incinerator which would impact the health of the general public, there being in the immediate area several food processing plants, schools and hospitals. The District further claims new information on technology to reduce the toxic emissions. SES disputes the new information produced by the District. Members of the public and various political figures have joined in the dispute and filed amici curiae briefs creating a public controversy. It is this very factual controversy and public controversy which creates the need for an EIR. California Code of Regulations, title 14, section 15064, subdivision (h) directs:

"In marginal cases where it is not clear whether there is substantial evidence that a project may have a significant effect on the environment [it] . . . shall be guided by the following factors:

"(1) If there is a serious public controversy over the environmental effects of a project [it] . . . shall consider the effect or effects subject to the controversy to be significant and shall provide an EIR. . . .

"(2) If there is disagreement between experts over the significance of an effect on the environment, [it] . . . shall treat the effect as significant and shall prepare an EIR."

Under these guidelines an EIR would be required where the effects of the toxic omissions may have substantial effects upon the environment and health of those persons within the proximity of the immediate and wind-carried fallout from the incinerator.

In *Mira Monte Homeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357, 365 [212 Cal.Rptr. 127], the county had certified an EIR as complete and subsequently learned that a road in the subdivision encroached onto the preserved wetlands upon which grew rare flora and fauna. Under Public Resources Code section 21166 the county, because of new information, was required to prepare a new EIR in that the paving over of that portion of the wetlands would have a significantly more severe impact upon the wetlands than previously recognized by the EIR. The court stated: " 'The report . . . may be viewed as an environmental 'alarm bell" whose purpose is to alert the public and its responsible officials to

environmental changes before they have reached ecological points of no return.' (*County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) 'One of its major functions . . . is to ensure that all reasonable alternatives to proposed projects are thoroughly assessed . . . .' (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 197 [132 Cal.Rptr. 377, 553 P.2d 537].)"

The *Mira Monte Homeowners* case deals with danger to flora and fauna. The EIR for this hazardous waste incinerator would evaluate the danger to human beings. The permits for the incinerator were based upon assumptions, now questionable, and the maintenance of a quality environment for the people of the state requires that the permits be reevaluated based upon current information. In light of the inconclusive information about the health effects of hazardous waste incineration, the latest technology and citizen participation should be considered in the decisionmaking process which can be achieved through an EIR. " 'By its very nature the protection of the environment to some degree, to a large degree, if not entirely, is a function of the technology that allows us to measure the deleterious effects of any activity or chemical or whatever it is, has.' " (*Meridian Ocean Systems, Inc. v. State Lands Commission, supra*, 222 Cal.App.3d at p. 165.)

The District as a condition of extending the permits in addition to requiring an EIR also required an updated HRA. Having determined that new information has become available since the permits were issued, an updated HRA should be prepared for the same legal and factual reasons set forth in the determination of the need for a new EIR. The greater the possible emissions, the greater the risk to not only the general population but to those subpopulations such as infants, smokers and persons with respiratory diseases.

■ The District has the right to require the use of updated BACT since SES does not have a vested right in the permits, nor is BACT excluded by Health and Safety Code section 42301.5. Substantial evidence supports the District's determination that the current BACT requirements are more stringent in reducing NOX, acid gases and particulates (and subsequently dioxins and furans) than those control systems submitted by SES. This evidence consists of the District research, the source test data along with the staff experience and opinion. The use of SCR on the incinerator can be cost effective and therefore technologically feasible BACT according to a recent report and presentation to the District by Mitsubishi Industries.

BACT is defined as the most stringent emission control limitation or control technique achieved in practice. BACT would be the state of the art

equipment. The final design and specifications submitted to the District for approval should be state of the art as of the date of submission and not state of the art as of several years ago. The purpose of the law is to protect the environment and the public health which requires the newest technology, not proposals for outdated equipment.

In the case of *Mobil Oil Corp.* v. *Superior Court* (1976) 59 Cal.App.3d 293 [130 Cal.Rptr. 814], the question arose as to whether oil companies could be required to provide seals and special equipment to recover gasoline fumes which were emitted into the air while dispensing gasoline to its customers. The oil companies claimed a vested right to continue to use equipment which it had been "permitted" to use for many years. The court held: "Here it appears the Oil Companies are asking us to determine they have a vested right to release gasoline vapors while dispensing fuel to their customers. How are we to answer the public, on the other hand, who assert a fundamental vested right to breathe clean air? If either exists, it must be the latter." (*Id*. at p. 305.)

The court in reviewing the decision of an administrative agency must use either the "independent judgment test" or the "substantial evidence test" (Code Civ. Proc., § 1094.5, subd. (c)). ■ Under the independent judgment test the court can independently weigh the evidence and resolve conflicts against the agency. (*Cerberonics, Inc.* v. *Unemployment Insurance Appeals Board* (1984) 152 Cal.App.3d 172, 175-176 [199 Cal.Rptr. 292].) Using the substantial evidence test the court must resolve reasonable doubts in favor of the administrative decision and uphold that decision if there is any substantial evidence to support the findings. (*Smith* v. *County of Los Angeles* (1989) 211 Cal.App.3d 188, 198 [259 Cal.Rptr. 231]; *Topanga Association for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12]; *Surfside Colony, Ltd.* v. *California Coastal Comm.* (1991) 226 Cal.App.3d 1260 [277 Cal.Rptr. 271].)

As previously discussed SES has not acquired a fundamental vested right in the 21 permits. If SES had acquired a fundamental vested right the court would be required to use the independent judgment test (*Bixby* v. *Pierro* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242]). Having studied the record consisting of 8,609 pages and applying the substantial evidence test, the court finds there is substantial evidence to support the findings and decision of the District. The District did not abuse its discretion. The court may only overturn the factual findings of the administrative agency under the substantial evidence rule if the evidence is insufficient as a matter of law to sustain the findings. (*Whaler's Village Club* v. *California Coastal Com.*

(1985) 173 Cal.App.3d 240, 251 [220 Cal.Rptr. 2]; *Barrie* v. *California Coastal Com.* (1987) 196 Cal.App.3d 8, 14 [241 Cal.Rptr. 477].)

■ An administrative agency has technical expertise to aid it in arriving at its decisions; the court does not have that degree of technical expertise. The court should limit itself to a review of the administrative agency's actions and not interfere with the discretionary judgments of the agency; a reviewing court should not substitute its own judgment for that of the agency. (*Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432 [261 Cal.Rptr. 574, 777 P.2d 610].)

### CONCLUSION

The District has no legal duty to extend the 21 permits for the construction of the hazardous waste incinerator by SES in Vernon, California, nor is the District estopped from denying such an extension. Thus, if the District can deny an extension of the permits, it can as a requirement of the extension of the permits attach the conditions which are consistent with its statutory duty to protect the environment.

### DISPOSITION

The judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

The appellant, District, is entitled to recover costs on this appeal.

Lillie, P. J., and Johnson, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied May 1, 1991.