COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| BOERNE TO BERGHEIM COALITION FOR CLEAN ENVIRONMENT, | § | |
| | § | No. 08-20-00035-CV |
| Appellant, | | |
| | § | Appeal from the |
| v. | | |
| | § | 459th District Court |
| TEXAS COMMISSION ON ENVIRONMENTAL QUALITY and VULCAN CONSTRUCTION | § | of Travis County, Texas |
| MATERIALS, LLC, | § | (TC# D-1-GN-18-003134) |
| | | |
| Appellees. | § | |

**O P I N I O N**

This is an appeal of a final judgment in a suit for judicial review of a state agency decision.

Boerne to Bergheim Coalition for Clean Environment, Appellant, filed a suit for judicial review

of the Texas Commission on Environmental Quality (TCEQ or Commission) Executive Director's

approval of Vulcan Construction Materials, LLC's (Vulcan)[1] application for a standard air-quality

permit.[2] The trial court affirmed the Executive Director's decision in a final judgment.

In its sole issue on appeal, Appellant urges Section 382.052 of the Texas Health and Safety

---

[1] Where applicable, we refer to TCEQ and Vulcan collectively as "Appellees."

[2] This case was transferred from the Third Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX.GOV'T. CODE ANN. § 73.001 We follow the precedent of the Third Court of Appeals to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

Code required TCEQ to consider the adverse short-term and long-term side effects of air contaminants on individuals attending a Montessori school within 3,000 feet of the proposed concrete batch plant site, and TCEQ failed to do so. TCEQ acknowledges Section 382.052 applies to Vulcan's application and claims it complied with Section 382.052's mandate in arriving at the Executive Director's decision. Vulcan argues its application precludes compliance with Section 382.052, but nevertheless agrees TCEQ considered the possible adverse effects on schoolchildren in proximity to the plant in arriving at its decision to grant the application.

We find Section 382.052 applies to Vulcan's application for its Boerne facility. We further find TCEQ complied with Section 382.052. Appellant's sole issue is overruled.

## ADMINISTRATIVE BACKGROUND

TCEQ administers permits and other activities for pollution-producing stationary sources under the Federal Clean Air Act and the Texas Clean Air Act.[3] The Texas Clean Air Act is codified in Chapter 382 of the Texas Health and Safety Code. *See generally* TEX. HEALTH & SAFETY CODE ANN. §§ 382.001-.510. The Environmental Protection Agency (EPA) identifies emissions causing or contributing to air pollution and sets National Ambient Air Quality Standards for those pollutants. *See* 42 U.S.C. § 7409 (1977). Among others, the EPA set National Ambient Air Quality Standards for particulate matter with an aerodynamic diameter less than or equal to ten micrometers ($PM_{10}$) and less than or equal to 2.5 micrometers ($PM_{2.5}$). *See* 40 C.F.R. § 50.6 (2006); *Id.* § 50.13 (2016); *Id.* § 50.18 (2013). Each state is responsible for submitting with the EPA a plan specifying how it intends to implement and maintain the National Ambient Air Quality Standards. *See* 42 U.S.C. § 7407(a)(2004).

---

[3] A brief history of the Texas Clean Air Act provides necessary context to the issues surrounding this case. Much of this history was provided by sources cited by TCEQ in its briefing.

Under the Texas Clean Air Act, anyone seeking to construct or modify a facility that emits or may emit air contaminants must obtain a permit from TCEQ. TEX. HEALTH & SAFETY CODE ANN. § 382.0518(a). The Texas Clean Air Act contains a standalone requirement to consider potential adverse side effects on attendees at any school within 3,000 feet of a proposed facility in deciding whether to issue a construction permit. *Id.* § 382.052.[4]

Originally, all pre-construction permits under the Texas Clean Air Act required a case-by-case review by TCEQ's predecessor agency based on Best Available Control Technology (BACT) and an air-quality analysis prepared by the applicant for the specific facility seeking a permit.[5] According to TCEQ, the data obtained in a BACT review and air-quality analysis is reviewed and audited by TCEQ staff, who use the information to prepare a permit containing general and special conditions unique to the facility by which the permit-holder must abide. *See* 30 TEX.ADMIN.CODE ANN. § 116.115 (2021) (Tex. Comm'n on Envtl. Quality, General and Special Conditions).

Later, the Legislature added standard permits under the Texas Clean Air Act. TCEQ's predecessor agency identified similar types of facilities to issue a standard permit for an entire category. TEX. HEALTH & SAFETY CODE ANN. § 382.05195(a). According to TCEQ, standard permits contain uniform requirements which are compliant with National Ambient Air Quality Standards and other public health standards. The EPA approved the use of standard permits in Texas's state implementation plan (Regular Standard Permits).[6]

---

[4] Originally, the Section 382.052 requirement was included among the requirements for a general new source review permit under Section 382.0518. *See* Act of May 27, 1985, 69th Leg., R.S., ch. 637, § 26, 1985; TEX.GEN.LAWS 2350, 2355. It was subsequently recodified in 1989 to a standalone requirement. *See* Act of May 18, 1989, 71st Leg., R.S., ch. 678, § 1, 1989 TEX.GEN.LAWS 2230, 2724 (codified at Tex. Health & Safety Code Ann. § 382.052).

[5] *See* 23 TEX.REG. 6973 (1998), *amended by* 24 TEX.REG. 8296 (1999), *amended by* 26 TEX.REG. 2398 (2001), *amended by* 27 TEX.REG. 8546 (2002), *amended by* 35 TEX.REG. 8944 (2010), *amended by* 39 TEX.REG. 2901 (2014), *amended by* 45 TEX.REG. 3093 (2020) (former 30 TEX.ADMIN.CODE ANN. § 116.111(a)(2)(A)(i) and (a)(2)(C)) (Tex. Nat. Resource Conservation Comm'n, General Application).

[6] Approval and Promulgation of Implementation Plans, Texas, 68 FED.REG. 64543 (November 14, 2003).

Concrete batch plants prepare concrete mix and emit pollutants $PM_{10}$ and $PM_{2.5}$.[7] Small concrete batch plants—those producing no more than 300 cubic yards of concrete mix per hour—are eligible for a Regular Standard Permit.[8] TCEQ's predecessor agency, in developing the Regular Standard Permit, conducted a protectiveness review.[9] The requirements of the Regular Standard Permit were based on a previously-issued permit by rule, which included BACT for concrete batch plants, distance limitations or setbacks based on emissions estimates, computer dispersion modeling, impacts analysis, and real-world plant observations. The protectiveness review applied "worst-case assumptions" for design, layout and operation conditions, as well as "worst-case emission control situations and hourly production rates . . . which could be authorized by the applicable portions of [the Regular Standard Permit]." Based on these "worst-case" assumptions, TCEQ's protectiveness review determined facilities operating in compliance with the Regular Standard Permit were protective of human health and welfare, as discussed in Section D below. The air-dispersion modeling predicted compliance with National Ambient Air Quality Standards 99.9% of the time at distances greater than one hundred feet from the facility's central baghouse.[10] TCEQ conducted a new protectiveness review, which included a separate review for $PM_{2.5}$, as part of the Standard Permit Amendments made effective in 2012.[11]

The Regular Standard Permit provides for public participation, including the ability for

---

[7] TCEQ, Amendments to the Concrete Batch Plants Air Quality Standard Permit (2012), p. 1, *available at* https://www.tceq.texas.gov/assets/public/permitting/air/NewSourceReview/Mechanical/cbpsp-finalpreamble.pdf (cited hereinafter Standard Permit Amendments).

[8] TCEQ, Air Quality Standard Permit for Concrete Batch Plants (2000), pp. 39-40, Sections 5(A) and 6(A), *available at* https://www.tceq.texas.gov/assets/public/permitting/air/NewSourceReview/Mechanical/cbpguid_final.pdf (cited hereinafter Regular Standard Permit).

[9] Regular Standard Permit, pp. 11-12.

[10] Regular Standard Permit, p. 19.

[11] Standard Permit Amendments, p. 1.

members of the public to request a contested-case hearing. *See* TEX. HEALTH & SAFETY CODE ANN. § 382.056. However, due to delays in contested-case hearings because of concerns outside TCEQ's jurisdiction, such as concerns about traffic, safety, noise, appearance, and property values, the Legislature in 2003 added the Standard Permit for Concrete Batch Plant with Enhanced Controls (CBPEC).[12] It is another standard permit for concrete batch plants, but contains enhanced emissions controls and a less cumbersome public notice and hearing procedure than the Regular Standard Permit.[13] Distance limitations and setbacks under the Standard Permit for CBPEC are equal to or exceed those previously determined as protective under the Regular Standard Permit.[14] Additionally, although a public hearing is required and public comments are allowed and must be considered by the Commission, the hearing is non-evidentiary. *See* TEX. HEALTH & SAFETY CODE ANN. § 382.05199(e), (f). Within thirty-five days of the public hearing, the Executive Director must approve or deny the application based on the requirements set out in the statute and issue a response to public comments received. *Id.* § 382.05199(e), (h)-(i).

## FACTUAL AND PROCEDURAL BACKGROUND

Vulcan produces construction aggregate materials and sought a permit to construct a concrete batch plant near Boerne, Texas (hereafter, the Boerne plant). The proposed site of the plant is approximately 2,000 feet from the Hill Country Montessori School. According to comments TCEQ received from members of the public in response to the permit application, children attending Hill Country Montessori School spend significant time outdoors at play and

---

[12] TCEQ, Air Quality Standard Permit for Concrete Batch Plants with Enhanced Controls (2004), p. 2, *available at* https://www.tceq.texas.gov/assets/public/permitting/air/NewSourceReview/Mechanical/techsum_permit3.pdf. (cited hereafter as CBPEC).

[13] Act of June 1, 2003, 78th Leg., R.S., ch. 361, § 3, 2003 TEX. GEN. LAWS 1546 (codified in Tex. Health & Safety Code Ann. §§ 382.05198 and 382.05199).

[14] CBPEC, p. 2.

learning, including tending to gardens and training for school athletic events. Community members concerned about construction of the Boerne plant formed the Boerne to Bergheim Coalition for Clean Environment.

Initially, Vulcan applied for a Regular Standard Permit. In response, Appellant requested a contested case hearing. Vulcan withdrew its Regular Standard Permit application and filed a new application for a Standard Permit for CBPEC. TCEQ declared Vulcan's permit for the Boerne plant technically complete on February 2, 2018.

TCEQ held the public hearing on the Boerne plant in Boerne, Texas. Over 400 community members appeared, and more than 1,200 comments were submitted to TCEQ. Approximately a month after the hearing, TCEQ's Executive Director mailed the response to the community members' comments and issued final approval of the permit application.

Appellant filed the instant lawsuit seeking judicial review of the TCEQ Executive Director's decision approving Vulcan's application of its Boerne plant. TCEQ answered and Vulcan intervened. After each party submitted briefs on the merits, the trial court affirmed TCEQ's decision approving Vulcan's application for the Boerne plant. This appeal followed. Of the four reasons Appellant urged the trial court as bases for overturning TCEQ's decision, only the school protectiveness review is at issue in this appeal.

## DISCUSSION

In its sole issue, Appellant asks us to determine "[w]hether the Texas Clean Air Act, Section 382.052 of the Health & Safety Code requires TCEQ to consider the proximity of a local school when reviewing an application for an Air Quality Standard Permit for a Concrete Batch Plant with Enhanced Controls." Appellant claims it does, but TCEQ nevertheless failed to consider it when it granted Vulcan's application for a Standard Permit for a CBPEC. Vulcan, on the other

6

hand, claims Section 382.052 does not apply to applications for Standard Permits for CBPEC and argues TCEQ was not under any obligation to consider the proximity of a school within 3,000 feet of the proposed site of its plant. TCEQ, in contrast, does not dispute Section 382.052 applies to applications for Standard Permits for CBPEC, and claims it complied with Section 382.052 in reviewing Vulcan's application for the Boerne plant.

The crux of the dispute between Appellant and TCEQ is TCEQ's alleged failure to consider the Hill Country Montessori School's proximity to the Boerne plant in deciding whether to grant or deny Vulcan's application. However, Appellant's issue explicitly asks us to decide whether Section 382.052 applies to Vulcan's application for the Boerne plant. Furthermore, Appellees maintain inconsistent positions regarding whether Section 382.052 applies to applications for Standard Permits for CBPEC. We therefore believe it prudent to first determine whether Section 382.052 applies to applications for Standard Permits for CBPEC, as Appellant requests. If the answer to that question is affirmative, we would then analyze whether TCEQ, in fact, complied with Section 382.052 in approving Vulcan's application. If we answer in the negative, our query ends.

We thus begin our analysis of whether Section 382.052 applies to an application for Standard Permit for CBPEC.

### Standard of Review

#### A. Substantial-Evidence Test

The Texas Clean Air Act provides: "[a] person affected by a ruling, order, decision, or other act of the commission or of the executive director, if an appeal to the commission is not provided, may appeal the action by filing a petition in a district court of Travis County." TEX. HEALTH & SAFETY CODE ANN. § 382.032(a). When a party seeks judicial review of the

7

Commission's decision, the issue for the reviewing court is whether the Commission's order was "invalid, arbitrary, or unreasonable." *United Copper Indus., Inc. v. Grissom*, 17 S.W.3d 797, 801 (Tex.App.—Austin 2000, pet. dism'd). If the reviewing court determines TCEQ's decision fails to meet this standard, the order must be set aside. *City of Waco v. Tex. Comm'n on Envtl. Quality*, 346 S.W.3d 781, 815 (Tex.App.—Austin 2011), *rev'd on other grounds*, 413 S.W.3d 409 (Tex. 2013). An agency abuses its discretion if its decision "(1) fails to consider a factor the Legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the Legislature directs it to consider but still reaches a completely unreasonable result." *Sierra Club v. Tex. Comm'n on Envtl. Quality*, 455 S.W.3d 214, 223 (Tex.App.—Austin 2014 pet. denied)(*quoting City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994)). In other words, an "arbitrary" order is one made "without regard to the facts." *See Gerst v. Nixon*, 411 S.W.2d 350, 354 (Tex. 1966)(*quoting Railroad Comm'n of Tex. v. Shell Oil Co.*, 139 Tex. 66, 161 S.W.2d 1022, 1029 (1942)).

The Commission's discretion to grant or deny permit applications arises from a legislative grant of exclusive jurisdiction over specific permits for regulated activities. *See* TEX. HEALTH & SAFETY CODE ANN. § 382.051. Accordingly, as a reviewing court, we must recognize the authority an administrative agency possesses and afford great deference to its interpretation of its own rules. *Phillips Petro. Co. v. Tex. Comm'n on Envtl. Quality*, 121 S.W.3d 502, 508 (Tex.App.—Austin 2003, no pet.). The "agency's construction of its rule is controlling unless it is plainly erroneous or inconsistent." *See Udall v. Tallman*, 380 U.S. 1, 17 (1965)("When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order."). A sub-issue on appeal is whether our standard of review also includes the substantial-evidence test contained in TEX.GOV'T CODE ANN. § 2001.174(2)(E). Appellant posits the decision under review

here was not the result of a contested-case hearing, and therefore, the substantial-evidence test is inapplicable. Appellees, on the other hand, assert the substantial-evidence test is nonetheless applicable, regardless of whether the Commission's order resulted from a contested case proceeding. In its reply brief, Appellant countered, "Logically, it makes sense that a substantial evidence standard does not apply, because without a contested case, there were no evidentiary proceedings from which a reviewing court could review adjudicated evidence and apply the substantial evidence standard."

Judicial review of administrative agency decisions is generally governed by the Administrative Procedure Act, which addresses contested-case proceedings and the framework of the substantial-evidence test. TEX.GOV'T CODE ANN. § 2001.001-.902; *Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 17 (Tex. 2000).

> If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
>
> .          .          .
>
> (2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> .          .          .
>
> > (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
> > (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

TEX.GOV'T CODE ANN. § 2001.174. However, as the language makes clear, the statute applies in contested cases, and it is not always clear what standard applies in reviewing an uncontested case. The substantial-evidence test evolved as an evidentiary mechanism for determining the arbitrariness and invalidity of agency orders. *Waco*, 346 S.W.3d at 816; *see also Gerst*, 411 S.W.2d at 354 ("The so-called substantial evidence rule may be more accurately described as a test rather

9

than a rule. When properly attacked, an arbitrary action cannot stand, and the test generally applied by the courts in determining the issue of arbitrariness is whether or not the administrative order is reasonably supported by substantial evidence."). In the absence of statutory guidance, Texas courts have ruled inconsistently on whether the substantial-evidence analysis applies to an "agency record that has not been developed through contested-case or other trial-like processes." *See Waco*, 346 S.W.3d at 817.

Turning to the case at hand, the decision under review regarded an application for a Standard Permit for CBPEC. *See* TEX. HEALTH & SAFETY CODE ANN. § 382.05198. This type of permit only requires a public hearing; it does not require a contested-case proceeding. *See id.* § 382.05199(a). The statute states, "A public hearing held under this section is not an evidentiary proceeding. Any person may submit an oral or written statement concerning the application at the public hearing." *Id.* § 382.05199(f). Although the decision under review here was not the result of a contested case hearing, the Texas Supreme Court has acknowledged the availability of a substantial-evidence review on an administrative record. *See Tex. Comm'n on Envtl. Quality v. City of Waco*, 413 S.W.3d 409, 424-25 (Tex. 2013)(*citing Collins v. Tex. Nat. Res. Conservation Comm'n*, 94 S.W.3d 876, 884-85 (Tex.App.—Austin, no pet.)). Likewise, the Austin Court of Appeals has, on previous occasions, applied the substantial-evidence test to determine the propriety of TCEQ decisions which did not result from a contested case hearing. *See, e.g.*, *Sierra Club*, 455 S.W.3d at 223 n.9 (applying substantial-evidence test to Commission's decision to deny contested case hearing request, which was not itself a contested-case hearing); *Tex. Comm'n on Envtl. Quality v. Sierra Club*, 455 S.W.3d 228, 235-36 (Tex.App.—Austin 2014, pet. denied)(same); *see also Ranna & Co. v. Tex. Comm'n on Envtl. Quality*, No. 03-16-00724-CV, 2018 WL 2347009 at *2 (Tex.App.—Austin May 24, 2018, no pet.)(dismissing appellant's

contention that "it is 'not possible' to conduct a substantial-evidence review of an agency decision made without a contested-case hearing. To the contrary, the Supreme Court and this Court have recently concluded that substantial-evidence review may be afforded on such a record.").

Here, an agency administrative record exists and was relied upon by the trial court in its approval of the permit application. The final judgment specifically states,

> After considering the pleadings, the briefs, **the administrative record**, the law, and the argument of the parties, the Court is of the opinion that the Texas Commission on Environmental Quality's ("TCEQ)" decision approving Vulcan Construction Materials LLC' s application to construct and operate a concrete batch plant under the Air Quality Standard Permit for Concrete Batch Plants with Enhanced Controls should be affirmed. [Emphasis added.]

Because there is a record that is the basis of agency action—the fundamental requirement for a substantial-evidence review—we conclude the standard of review under the limited facts of this case will be conducted pursuant to a substantial-evidence review. *See Ranna & Co.*, 2018 WL 2347009 at *2.

## B. Statutory Construction

We review issues of statutory interpretation *de novo*. *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014). When a reviewing court construes a statute, it must determine and give effect to the Legislature's intent. *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). The statute must be enforced as it is written, and the reviewing court must "refrain from rewriting text that lawmakers chose." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009).

We first consider the "plain and common meaning of the statute's words." *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998). Only where doing so "leads to absurd or nonsensical results[,]" or "a different meaning is apparent from the context [of the statute]" should the words' plain meaning be disregarded. *See Jaster*, 438 S.W.3d at 562

11

(*quoting Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011)). Additionally, the specific statutory language must be considered in the context of the statute as a whole. *Id.* (*quoting TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)). Like the Texas Supreme Court in *Jaster*, our analysis begins with the statute's words and proceeds with "the apparent meaning of those words within their context." *Id.*

*Analysis*

## A. Plain Language of the Statute

In this case, we must first construe Section 382.052. It reads:

PERMIT TO CONSTRUCT OR MODIFY FACILITY WITHIN 3,000 FEET OF SCHOOL. In considering the issuance of a permit to construct or modify a facility within 3,000 feet of an elementary, junior high, or senior high school, the commission shall consider possible adverse short-term or long-term side effects of air contaminants or nuisance odors from the facility on the individuals attending the school facilities.

TEX. HEALTH & SAFETY CODE ANN. § 382.052.

First, we look at the plain language of the statute. *See Garrison Contractors, Inc.*, 966 S.W.2d at 484. Section 382.052 contains the word "shall," a term which has been the subject of much discussion in this state's jurisprudence. *See, e.g.*, *Wichita County v. Hart*, 917 S.W.2d 779, 781 (Tex. 1996); *In re Perkins*, 512 S.W.3d 424, 431 (Tex.App.—Corpus Christi 2016, no pet.); *Chavez v. McNeely*, 287 S.W.3d 840, 844 (Tex.App.—Houston [1st Dist.] 2009, no pet.); *Allison v. Fire Ins. Exchange*, 98 S.W.3d 227, 241 (Tex.App.—Austin 2002, pet. granted, judgment vacated w.r.m.). When used in a statute, "shall" generally indicates the Legislature's intent that the directive is mandatory. *See In re Perkins*, 512 S.W.3d at 431; *see also Brinkley v. State*, 320 S.W.2d 855, 856 (Tex.Crim.App. 1958)("'Must' and 'shall' are synonymous and are usually mandatory when used in statutes."). As with any issue involving statutory construction, our goal

12

is deriving legislative intent from the plain meaning of the statute's words. *See City of DeSoto v. White*, 288 S.W.3d 389, 394 (Tex. 2009). Nothing in Section 382.052 indicates the Legislature intended a deviation from the plain meaning of the word "shall" and its usual mandatory application. We therefore find it is appropriate to treat it as such in this instance.

Next, and of critical importance in this case, is the statute's use of the word "consider." "Consider" is not defined by the statute, and so we give it its plain and ordinarily-understood meaning, unless context dictates a different meaning "or the plain meaning leads to absurd or nonsensical results." *Jaster*, 438 S.W.3d at 562 (internal quotation marks omitted).

We begin our analysis with the dictionary definition of "consider." *See Epps v. Fowler*, 351 S.W.3d 862, 873 (Tex. 2011)(Hecht, J., dissenting)("The place to look for the ordinary meaning of words is . . . a dictionary."). Merriam-Webster defines "consider" as, "to think about carefully: such as to think of especially with regard to taking some action[, or] to take into account."[15] Dictionary.com defines "consider" as, "to think carefully about, especially in order to make a decision; contemplate; reflect on[.]"[16]

We are unaware of any Texas case law interpreting the term "consider." However, courts in other jurisdictions have interpreted it according to the dictionary definition.[17] We think it

---

[15] *Consider*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/consider (last visited February 8, 2022). Additional inapplicable definitions include, "to regard or treat in an attentive or kindly way," "to gaze on steadily or reflectively," "to come to judge or classify," "regard," and "suppose." *Consider*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/consider (last visited June 4, 2021).

[16] *Consider*, DICTIONARY.COM, https://www.dictionary.com/browse/consider (last visited February 8, 2022). Additional inapplicable definitions include, "to regard as or deem to be[;] to think, believe, or suppose[;] to bear in mind; make allowance for[.]" *Consider*, DICTIONARY.COM, https://www.dictionary.com/browse/consider (last visited June 4, 2021).

[17] *See, e.g., Craig v. City Council of Kent, Ohio*, 90-P-2247, 1991 WL 147437, at *4 (Ohio Ct. App. Aug. 2, 1991), cause dismissed, 65 Ohio St. 3d 1403, 598 N.E.2d 710 (1992)(using the Webster Dictionary definition of consider, meaning an act "to reflect on."); *Manning v. Varges*, 413 So. 2d 116, 117 (Fla.Dist.Ct.App. 1982)(using The American Heritage Dictionary of the English Language definition of "consider" as "[t]o deliberate upon; examine; study."); *Penn v. Town of Barnstable*, 17 MISC 000009 (MDV), 2018 WL 2085547, at *3 (Mass. Land Ct. Apr. 30, 2018) *aff'd*

appropriate to treat it similarly and apply its plain and common meaning of "to think carefully about," "reflect on," and "to take into account."

We also examine the word "possible," which the Legislature used to modify the adverse short-term or long-term side effects, if any, of persons at the nearby school. *See* TEX. HEALTH & SAFETY CODE ANN. § 382.052. The statute does not define "possible," so again, we look to the plain and common meaning as defined by dictionary sources. *See Epps*, 351 S.W.3d at 873 (Hecht, J., dissenting). Merriam-Webster defines "possible" as "being within the limits of ability, capacity, or realization[;]" "being what may be conceived, be done, or occur according to nature, custom, or manners[;]" "being something that may or may not occur[;]" "being something that may or may not be true or actual[;]" or "having an indicated potential[.]"[18] Dictionary.com defines it as "that may or can be, exist, happen, be done, be used, etc." or "that may be true or may be the case, as something concerning which one has no knowledge to the contrary[.]"[19]

We are unaware of any Texas case law interpreting the word "possible." However, other jurisdictions' employ its plain meaning as found in various dictionary sources are consistent with the definitions provided above.[20] We therefore understand "possible" to have the common meaning of being something that may occur, no matter how likely or remote the probability.

---

*sub nom. Penn vs. Town of Barnstable*, 133 N.E.3d 846 (2019)(referencing the Black's Law Dictionary definition of "consider" as "to think about, or to ponder or study and to examine carefully."); *State v. Brinkley*, 824 N.E.2d 959, 976 (Ohio 2005)(using the Webster's Ninth New Collegiate Dictionary and Black's Law Dictionary definitions of "consider").

[18] *Possible Definition*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/possible (last visited February 8, 2022).

[19] *Possible Definition*, DICTIONARY.COM, https://www.dictionary.com/browse/possible (last visited February 8, 2022).

[20] *See, e.g., State v. Benjamin M.R.*, 199 Wis.2d 127, *2 (Wis.Ct.App. 1995)(relying on Webster's Third New International Dictionary defining "possible" as "falling within the bounds of what may be done . . . ."); *Cleghorn v. Scribner*, 597 So. 2d 693, 697 n.3 (Ala. 1992)(relying on the Black's Law Dictionary definition of "possible"); *Sec. Envtl. Sys., Inc. v. S. Coast Air Quality Mgmt. Dist.*, 280 Cal. Rptr. 108, 119 (Cal.Ct.App. 1991)(referencing The

Finally, we consider Section 382.052's use of the terms "air contaminant" and "nuisance odors." *See* TEX. HEALTH & SAFETY CODE ANN. § 382.052. "Air contaminant" is defined by the Clean Air Act as "particulate matter, radioactive material, dust, fumes, gas, mist, smoke, vapor, or odor, including any combination of those items, produced by processes other than natural." *Id.* § 382.003(2). "Nuisance odors" is not defined by the Act. However, because "air contaminant" includes "odors" (whether a nuisance or otherwise) within its definition, there is no need to seek out an additional meaning of "nuisance odors" for purposes of interpreting Section 382.052's meaning. *See Jaster*, 438 S.W.3d at 566 ("[W]here two or more words of analogous meaning are employed together in a statute, they are understood to be used in their cognate sense, to express the same relations and give color and expression to each other.")(*quoting Harris Cnty. v. Eaton*, 573 S.W.2d 177, 181 (Tex. 1978)).

## B. Context of the Statute

With the plain meanings of "shall," "consider," "possible," and "air contaminant" established, we examine the context of those terms juxtaposed with the remaining pertinent parts of the Texas Clean Air Act. *See Jaster*, 438 S.W.3d at 565. Section 382.052 reads, "the commission shall consider possible adverse short-term or long-term side effects of air contaminants or nuisance odors from the facility on the individuals attending the school facilities." *See* TEX. HEALTH & SAFETY CODE ANN. § 382.052. Thus, within the context of Section 382.052, in deciding whether to issue a permit for the plant's construction, TCEQ is required to account for any potential adverse short-term or long-term side effects of particulate matter, radioactive material, dust, fumes, gas, mist, smoke, vapor, and/or odor, and any combination of those items, that may be produced by the

---

American Heritage Dictionary definition of "possible" as "[p]ossibly indicates that something is realizable as an end. It can imply either a moderate degree of probability or the barest chance within the limits of circumstances.").

proposed Vulcan plant on the persons attending Hill Country Montessori School. Using the typical application of "shall" and the common definitions of "consider," "possible," and "air contaminant" in Section 382.052 is congruous with the remaining language of the section.

As it pertains to the remainder of the Texas Clean Air Act, we specifically address how Section 382.052 interacts with Section 382.05198, which provides the requirements for Standard Permits for CBPECs. TCEQ and Vulcan argue Section 382.05198 provides an exclusive nineteen-factor list which, once all requirements are satisfied, warrants approval of an applicant's permit. TCEQ goes further, stating that compliance with the nineteen requirements adequately considers the effects on nearby school children and satisfies its obligation under Section 382.052 because TCEQ conducted a protectiveness review which "accounts for children and other sensitive members of the population" and formulated the requirements for a Standard Permit based the protectiveness review's results. Appellant urges that Section 382.052 does not contain limiting language making it inapplicable to CBPECs, and therefore must still be an independent factor examined by the Commission in deciding whether to grant or deny an application.

We find the two sections read together do not contradict one another or otherwise create ambiguity. Section 382.05198 begins, "(a) The commission shall issue a standard permit for a permanent concrete plant that performs wet batching, dry batching, or central mixing and that meets the following requirements:" and lists nineteen factors ranging from record-keeping requirements to specific filter requirements to emissions standards, and others. *See* TEX. HEALTH & SAFETY CODE ANN. § 382.05198. Nothing in Section 382.05198 expressly prohibits the Commission from considering other factors in deciding whether to approve an application for a standard permit. On the contrary, the Legislature has expressly required other factors TCEQ must consider in deciding whether to issue a permit, such as the effect on nearby school children,

16

comments from the public, or the permit applicant's compliance history. *Id.* §§ 382.05198, 382.0199(h), 382.052; 30 Tex.Admin.Code Ann. § 60.1(a)(2021).

Additionally, while we offer no opinion on whether the nineteen requirements in Section 382.05198 are exclusive, we find they factor in the protectiveness reviews previously conducted by TCEQ when it created the Regular Standard Permit and subsequent Standard Permit Amendments; indeed, the requirements in the present version of the Standard Permit for CBPEC were formulated based on the results of the protectiveness reviews conducted by TCEQ.

As TCEQ notes in its brief, Section 382.052 was enacted before the Regular Standard Permit was created by statute.[21] When the Legislature added the Regular Standard Permit, TCEQ's predecessor agency created uniform requirements based on the results of a protectiveness review, which are compliant with National Ambient Air Quality Standards and other public health standards. TCEQ conducted a new protectiveness review, which included a separate review for PM$_{2.5}$, as part of the Standard Permit Amendments made effective in 2012.[22] Both protectiveness reviews applied "worst-case assumptions" and were shown to be protective of human health and welfare.[23] It is apparent the requirements to obtain a Standard Permit for CBPEC, *at this time* and under the specific circumstances in this case, contemplate the safety of nearby populations in harmony with the mandate of Section 382.052.[24] However, we stop short of rendering a blanket

---

[21] *See* Act of May 18, 1989, 71st Leg., R.S., ch. 678, § 1, 1989 Tex.Gen.Laws 2230, 2724 (codified at Tex. Health & Safety Code Ann. § 382.052); 29 Tex.Reg. 8403 (Aug. 27, 2004).

[22] Standard Permit Amendments, p. 1.

[23] Standard Permit Amendments, p. 1.

[24] The dissent asserts our opinion concludes "section 382.05198 repealed the school protectiveness review for concrete facilities meeting the standard permit requirements." However, that is incorrect. Our opinion concludes that *both* Sections 382.05198 and 382.052 apply and can be read harmoniously together. The requirements of Section 382.05198 as presently written consider the possible adverse side effects of air contaminants from the facility on nearby populations, which necessarily includes individuals at nearby school facilities; the requirements were created based on the results of multiple protectiveness reviews. Thus, at present, when meeting the present requirements in Section 382.05198, the requirements of a school protectiveness review in Section 382.052 are also met.

17

holding that the requirements for a Standard Permit for CBPEC, when satisfied by an applicant, obviate TCEQ's continuing obligation to consider the effects of emitted contaminants from a proposed facility on a school within 3,000 feet of the facility. As technology evolves and time passes, so long as the mandate of Section 382.052 is in place, TCEQ must abide by it.[25]

## C. Absurdity and Statute's Purpose

Finally, we look at whether "enforce[ing] the plain meaning of a statute's text . . . '[would lead] to absurd or nonsensical results.'" *Jaster*, 438 S.W.3d at 568-69 (*quoting Molinet*, 356 S.W.3d at 411).

The purpose of Section 382.052 is to protect the welfare of persons attending and working in schools within 3,000 feet of a proposed concrete batch plant. The obvious concern for their health and well-being is why the Legislature codified the requirement that TCEQ consider possible adverse effects on those vulnerable populations in determining whether to issue a permit. *See* TEX. HEALTH & SAFETY CODE ANN. § 382.052. TCEQ incorporated concerns about safety of nearby populations into the requirements of the Regular Standard Permit by ensuring that operating within the specified requirements and conditions of that section ensured safety of human health and welfare, even under "worst-case" projections.[26] Section 382.05198 outlines the same requirements and conditions intended to ensure protection of the populace as that of the Regular Standard Permit, plus additional controls for reduced emissions. *See* TEX. HEALTH & SAFETY CODE ANN. § 382.05198.

However, what Section 382.052 does *not* mandate is that TCEQ or the Applicant provide

---

[25] Though perhaps unlikely, it is not unfathomable that at some point in the future, requirements to obtain a standard permit of any type may not, in and of themselves, indicate consideration of nearby populations, including school children. For that reason, we find it necessary to limit our holding accordingly.

[26] *See* Regular Standard Permit, pp. 11-19.

18

site-specific air-dispersion modeling of a proposed plant. It is unclear whether Appellant posits that such modeling is the only means of compliance with Section 382.052, but we expressly hold otherwise. To require each applicant or the Commission to supply a new site-specific particle dispersion model for each Standard Permit, whether the CBPEC or the Regular Standard Permit, not only rewrites the text of Section 382.052 but also frustrates the purpose of the Regular Standard Permit and the Standard Permit for CBPEC and leads to "absurd or nonsensical results." *See Jaster*, 438 S.W.3d at 568-69 (*quoting Molinet*, 356 S.W.3d at 411). The CBPEC permit explicitly "eliminates any requirement for applicants to submit modeling and impacts analysis for the review of a standard permit application."[27] The need for individual, site-specific studies was eliminated because the standard permit requirements were developed following an "extensive protectiveness review . . . address[ing] emission rates and distance limitations for these facilities."[28]

Applying the plain meaning of language contained in Section 382.052 is consistent with the statute's purpose and does not lead to absurd or nonsensical results. Based on the foregoing de novo review in construing Section 382.052, we find it applies to Vulcan's application for its Boerne facility.

**D. Did TCEQ consider the possible adverse short-term or long-term side effects of air contaminants and nuisance odors in deciding whether to grant Vulcan's application for the Boerne plant, given the proximity of Hill Country Montessori School to the proposed site location?**

In accordance with the standard of review, we now examine whether the Commission's decision to approve Vulcan's application is supported by substantial evidence, or if it was "invalid,

---

[27] TCEQ, Air Quality Standard Permit for Concrete Batch Plants with Enhanced Controls (2004), p. 3, *available at* https://www.tceq.texas.gov/assets/public/permitting/air/NewSourceReview/Mechanical/techsum_permit3.pdf. (CBPEC).

[28] *Id.*

arbitrary, or unreasonable" for allegedly failing to comply with Section 382.052. *See Grissom*, 17 S.W.3d at 801; *Sierra Club*, 455 S.W.3d at 223 (*quoting City of El Paso*, 883 S.W.2d at 184). We already determined TCEQ considered the health and safety of nearby populations when it created the requirements for the Regular Standard Permit and the Standard Permit for CBPEC. However, our review must encompass the circumstances of this case to ascertain whether the administrative record contains substantial evidence demonstrating TCEQ considered the proximity of Hill Country Montessori School and potential adverse side effects to its attendees in granting Vulcan's permit application.

Three comments raised by the public, and the Executive Director's response to them, specifically related to the protectiveness review and/or the proximity of Hill Country Montessori School to the proposed plant.

Comment 1 and Response 1

In Comment 1, the Executive Director discussed various comments expressing concern regarding Hill Country Montessori School's proximity to the proposed plant. Specifically, the comment authors worried about wind carrying particulate and contaminants toward the school's playground.

In response, the Executive Director discussed the "extensive protectiveness review for the Air Quality Standard Permit for Concrete Batch Plants" completed in 2000 which established the technical requirements for the Standard Permit, such as property line distance requirements, compliance with National Ambient Air Quality Standards for the particulates emitted from concrete batch plants, and "maximum production rates at which a plant's operation will not be detrimental to human health and welfare or the environment." Based on the protectiveness of the standard permit requirements, plus the added controls in place for a Standard Permit for CBPEC,

20

the Commission determined CBPEC emissions "are not expected to be detrimental to human health and welfare or the environment."

The Executive Director explained at length how the EPA established the National Ambient Air Quality Standards. Further, the report explains primary contaminants having the potential to be emitted from a plant like the Boerne plant are dust particles, and in determining their range of dispersion from the plant, all "potential dust concentrations have been evaluated using reasonable worst case operating parameters and compared to the federal criteria mentioned above." During the protectiveness review for the standard permit, TCEQ determined a plant constructed and operated within the standard permit's requirements would be protective at the property line.

Response 1 of the report also discusses a new protectiveness review prepared in 2012 for the concrete batch plant standard permit amendment, which "included modeling analysis demonstrating compliance with the [particulate matter] 24-hour and annual [National Ambient Air Quality Standards]." The report states enhanced controls required on CBPECs, such as further setbacks from property lines, additional road paving, and prohibited use of a diesel engine, falls within the limits of the protectiveness review for the Regular Standard Permit dated September 24, 2012. The Executive Director details the compliance parameters for the Regular Standard Permit, such as dust control processes, filter systems, and enclosed conveying systems. All compliance parameters for the Regular Standard Permit are also present in the Standard Permit for CBPEC.

Comment 4 and Response 4

Comment 4 involved the model used by TCEQ in the air quality analysis conducted for Standard Permits for CBPEC, with some comment authors noting the EPA-preferred refined model was not utilized. These comments raised the issue of the lack of site-specific data which would not account for variables such as high winds in the area or the welfare of children attending school

near the site of the proposed Boerne plant.

In response, TCEQ reiterated a protectiveness review was conducted as part of developing the requirements for the Regular Standard Permit, such that any plant operating under the Standard Permit and in compliance with its regulations would not cause adverse health effects to nearby populations. Comprehensive air dispersion modeling used to evaluate impacts resulting from the proposed plant's operations employed "conservative assumptions, such as all emission sources operating continuously and simultaneously at maximum emission rates, and achieving and sustaining maximum production rates." The review—or perhaps more accurately, its results— helped establish maximum daily and annual production limits allowed for operating under the Standard Permit.

TCEQ explained the various considerations from the Standard Permit's protectiveness review, including: "emission source types and associated emission parameters; meteorological data; a receptor grid, and model use and techniques." We find it useful to include TCEQ's explanation of the protectiveness review in full:

> **The TCEQ developed the protectiveness review based on modeling that was inherently conservative and tends to over-predict ground-level concentrations of emissions from the proposed facility. The TCEQ applied the model in a screening mode to ensure predictions were conservative (higher predicted concentrations) and applicable for any location in the state.** For example, the protectiveness review evaluated both rural and urban dispersion coefficients, and the higher of the two options was used as the maximum predicted concentration for developing the standard permit conditions. In addition, all emissions sources were co-located to minimize bias due to source configuration and wind direction. This technique also provides conservative results because the impact from all sources is maximized. The maximum modeled concentration typically occurs at a relatively short distance from the source, so that the peak modeled concentrations represent the source's impact at only a relatively few receptors within the modeled area. Therefore, review of other off-site sources is not necessary when determining approval of any particular standard permit application.

**The modeling must also demonstrate the standard permit is protective anywhere in the state. The TCEQ used a reasonable "worst-case" screening approach to define the meteorology, which would be applicable to any location in the state. The modeling analysis used a five-year data set of National Weather Service surface data from Austin and upper air data from Victoria.** Because the analysis is primarily for short-term concentrations, this five-year data set would include worst-case short-term meteorological conditions that occur anywhere in the state. Additionally, since only a single set was used, the wind directions were set at 10-degree intervals to be coincident with the receptor grid radials. **This adjustment should provide impacts at a receptor that reflect worst-case meteorological conditions, since the plume centerline intersects the receptor directly.**

Regarding the comments on the model used, AERMOD is EPA's currently preferred model for major new source review projects; that is, those new or modified major projects that trigger federal review. Since the projects authorized under the standard permit cannot be major, the TCEQ used the ISCST3 model (ISC) to conduct the protectiveness review. The TCEQ uses the ISC model for minor source permitting. The ISC model has been used in permitting for more than 20 years. The model was developed to be easy to use and address complex atmospheric processes in a relatively simple way that can be understood by all users.

**The results of the protectiveness review using the maximum production limits indicated that the standard permit is protective based on the effects screening level guidelines and ambient air standards for the contaminants typically emitted from a concrete batch plant. Because the Applicant has represented that they will operate within the terms of the Standard Permit, adverse health effects are not expected, and the Applicant is not required to conduct additional modeling.** [Emphasis added.]

Comment 18 and Response 18

In Comment 18, TCEQ noted several concerns about the proximity of the proposed plant to Hill Country Montessori School, particularly because its students spend a significant amount of time outdoors as part of their curriculum. Some comments specifically referenced the contents of Section 382.052 and TCEQ's requirement to consider possible adverse effects of air contaminants or nuisance odors from proposed facilities within 3,000 feet of a school.

In response, TCEQ once again reiterated it determined plants operating within the required limits and specifications of the Standard Permit were protective at the property line. It stated no

23

adverse effects are expected from facilities meeting all the requirements of the Standard Permit.

Appellant vociferously asserts TCEQ's decision did not consider a protectiveness review specifically regarding a CBPEC. However, as previously discussed, the permit for a CBPEC contains identical requirements to that of the Regular Standard Permit for dust control that exceeds current best available control technology, and distance and setback limitations that equal or exceed what is necessary to verify its protectiveness of the public.[29] Nothing in Section 382.052 requires a duplicate study to be prepared for a CBPEC permit when plants operating under Regular Standard Permits—with fewer controls than a CBPEC—have already been deemed protective.

It is clear from our review of the administrative record that TCEQ considered evidence of the impact of possible air contaminants on nearby populations, including children attending the Hill Country Montessori School, for risks both probable and remote. Specifically, the previous protectiveness reviews factored in worst-case conditions and maximum production quantities to determine the requirements necessary for facilities operating under the Standard Permit for CBPEC to be protective at or before the property line, even for vulnerable members of the population. The record demonstrates TCEQ considered these prior protectiveness reviews and their outcomes in granting Vulcan's application for a Standard Permit for CBPEC.

The breadth of the word "consider" in Section 382.052 limits our obligation to scrutinize TCEQ's conduct as to what degree it considered the potential adverse effects on the Hill Country Montessori School's attendees. The Court's job is to determine **whether** TCEQ took into account the short- and long-term side effects of emitted contaminants on the school and its students, not **how much** they considered it. The distance of the school from the plant placed the school's

---

[29] CBPEC, p. 3.

attendees outside of the range of dangerous short- or long-term effects, which was known to the agency based on the previous protectiveness reviews. Section 382.052 does not require retesting under these circumstances. The record reflects TCEQ considered the Hill Country Montessori School and the impacts on the students in comparison with the known levels of contaminants and the perimeter of safety at a point closer to the facility than the school, and determined the school's distance from the proposed site of the Boerne plant did not preclude granting Vulcan's application for a Standard Permit for CBPEC.

Accordingly, there is substantial evidence in the administrative record indicating TCEQ complied with its obligation under Section 382.052 to consider the possible short-term and long-term effects of air contaminants from the proposed facility on the attendees at Hill Country Montessori School.

Appellant's sole issue is overruled.

### CONCLUSION

We hold Section 382.052 applies to Vulcan's application for Standard Permit for CBPEC for the Boerne plant. We also find the administrative record contains substantial evidence demonstrating TCEQ considered possible long-term and short-term adverse consequences of air contaminants and nuisance odors on attendees at the Hill Country Montessori School in compliance with Section 382.052 of the Texas Health and Safety Code, and TCEQ did not act invalidly, unreasonably, or arbitrarily, or otherwise abuse its discretion, in granting Vulcan's application for a Standard Permit for CBPEC.

Having overruled Appellant's sole issue on appeal, we affirm the judgment of the trial court.

25

August 16, 2022

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox J., and Ferguson, Judge
Ferguson, Judge (Sitting by assignment)
Palafox, J., Dissenting